UNITED STATES, Appellee

v

EDWIN L. WARTSBAUGH, Private First Class, U. S. Army, Appellant

21 USCMA 535, 45 CMR 309

No. 24,829

July 28, 1972

*Captain John D. Lanoue* argued the cause for Appellant, Accused. With him on the brief were *Colonel George J. McCartin, Jr., Colonel Arnold I. Melnick,* and *Lieutenant Colonel Joseph E. Donahue.*

*Captain Stan L. Spangler* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant, Lieutenant Colonel Ronald M. Holdaway, Captain Glenn R. Bonard, Captain Richard L. Menson,* and *Captain Leon J. Schachter.*

### Opinion of the Court

DUNCAN, Judge:

#### I

The first issue on which we granted review is whether specification 2 of the Charge fails to state an offense. That specification reads:

"In that . . . wrongfully communicate to 1 LT John R. Hoffman a threat to injure him by saying 'You

had better take my weapon because you might not make it back,' or words to that effect."

There is no registration of dissatisfaction with the specification on the frequently asserted basis that the language employed does not apprise the accused of the nature of the offense charged so that a defense can be prepared. However, appellant, in essence, complains that the reasonable meaning of the specification on its face contradicts the existence of an expressed intent to injure Lieutenant Hoffman presently or in the future; therefore, it does not state an offense. Paragraph 213f(10), Manual for Courts-Martial, United States, 1969 (Revised edition). The specification alleges all elements essential to the offense. Although we fully appreciate the necessity of the intent factor for conviction for wrongfully communicating a threat, we cannot say as a matter of law that the Government could not produce evidence of surrounding circumstances from which a reasonable finder of fact could lawfully determine from the acts and statement of an accused that there was intent to injure presently or in the future. For instance if an accused were to point a loaded weapon at another, leave it in that position for an extended time, and utter the language set forth in the specification here under review, we believe that reasonable minds could believe beyond a reasonable doubt that a threat had been wrongfully communicated. Resort to the contingency expressed in the declaration requiring the taking of a loaded weapon from another under such hypothetical circumstances is an alternative that only the most courageous would dare exeircse.

Mindful that we have not specifically granted review of the matter of the sufficiency of the evidence adduced regarding the threat offense, nevertheless, employing our discretion, we choose to do so. We do this for the reason that such procedure will final-

ize the litigation surrounding that offense, and because both parties have briefed and argued the matter of the sufficiency of the evidence.

The incident occurred on April 13, 1970, while those involved were engaged in field operations against the enemy. Lieutenant Hoffman testified that during a confrontation with the accused, the latter became angry, picked up his weapon, started to insert the magazine, and said (to Hoffman): " 'Sir, you had better take this from me too or you may not make it back.' " The accused did not point the weapon at the Lieutenant, who was approximately four to five feet away, and no difficulty was experienced in taking the rifle from him. When the unit arrived at Fire Base Bastogne later that day, the rifle was returned. After that, the accused did not threaten or attempt to injure the Lieutenant although both men remained in the field.

Sergeant Boles, who testified that he was present and took the rifle from the accused, stated that he believed the latter was speaking to him. "He told me that I had better take it because he, Lieutenant Hoffman, might not make it back." The accused did not complete his action of inserting the magazine in the weapon. Boles also related that he believed the accused was angry with the Lieutenant.

The accused testified that when Boles took his weapon from him he became "a little bit mad—quite mad, actually." He told the court:

"I was trying to put my magazine in my weapon. . . . For some reason, they thought that I was mad and they took my weapon from me. This made me mad, so I just told him that I wanted him to keep it."

He "may have" said the words set forth in the specification, although he was "not certain," but he did not mean to hurt Lieutenant Hoffman at any time.

The import of the circumstances attending a verbal declaration alleged to be an unlawful threat are highly rele-

vant in the evaluation of whether the evidence is sufficient to ▇▇▇▇▇ ▇ convict. In United States v Gilluly, 13 USCMA 458, 460, 461, 32 CMR 458 (1963), this Court stated:

"The offense [of communicating a threat] is complete when one wrongfully communicates to another an ' "avowed present determination or intent to injure presently or in the future." ' United States v Holiday, 4 USCMA 454, 456, 16 CMR 28 [1954]. The intent which establishes the offense is that expressed in the language of the declaration, not the intent locked in the mind of the declarant. United States v Humphrys, 7 USCMA 306, 307, 22 CMR 96 [1956]. Thus, the presence or absence of an actual intention on the part of the declarant to effectuate the injury set out in the declaration does not change the elements of the offense. *This is not to say the declarant's actual intention has no significance as to his guilt or innocence.* A statement may declare an intention to injure and thereby ostensibly establish this element of the offense, but *the declarant's true intention, the understanding of the persons to whom the statement is communicated, and the surrounding circumstances may so belie or contradict the language of the declaration as to reveal it to be a mere jest or idle banter.* United States v Humphrys, supra, page 307. Ragansky v United States, 253 Fed 643 (CA7th Cir)(1918)."

See also United States v Dunbar, 20 USCMA 478, 43 CMR 318 (1971); cf. United States v Shropshire, 20 USCMA 374, 43 CMR 214 (1971).

In *Shropshire,* we held that the words, "if you take this restraining gear off, I'll show you what I will do to you," to be more braggadocio than a threat of a kind that a reasonable member of the armed forces should be concerned about. The words uttered expressed a contingency that neutralized the declaration, since there was not a reasonable possibility the uncertain event would happen.

In *Dunbar,* we held appellant's plea of guilty to communicating a threat to be improvident when the record reflected that Dunbar was locked in a cell at the time he said to Sergeant Brown, "I'll kill you." A stipulation of fact reflected that Dunbar's intention in speaking these words was to direct Brown's attention away from what he was doing in another cell.

In both *Shropshire* and *Dunbar,* neither accused made any effort to carry out their threats when relieved of their restraints.

The facts in this case are somewhat similar to those which were present in United States v Rutherford, 4 USCMA 461, 16 CMR 35 (1954). Rutherford was detained in the guardhouse for one evening. The next morning two soldiers came to return him to his organization. Rutherford told the confinement officer, " 'Sir, let me stay here. . . . If I go back to my unit, I will kill him.' " (*Id.,* at page 462.) He then indicated that he was referring to Lieutenant Driscoll, his company commander. At the time of these statements, Rutherford was in a highly excited state and was described as bordering on crying. On the following day, Rutherford went before a summary court for being absent without leave. There he reiterated his request to be confined, stating he was going to kill his commanding officer to whom he attributed all of his difficulties. In reversing Rutherford's conviction for communicating a threat to kill his commanding officer, this Court stated at pages 462, 463:

". . . A careful analysis of the evidence in this case definitely establishes that no threat was made by the accused. All the witnesses agree that when the statements were made, the accused was in a highly emotional, almost irrational, state. And yet, he appreciated the possibility that he would injure his commanding officer unless forcibly restrained within a confinement facility. Each of his utterances was designed to convey this fear to his listeners. Rather than demonstrating 'an avowed present

determination or intent to injure presently or in the future,' the accused's words and actions reveal a fixed purpose to avert such a result. Although such violent actions are hardly commendable, they do not constitute the offense of communicating a threat, for here no threat was made."

In the case at bar all agree that the accused was angry and extremely upset. His statement, " 'You had ■ better take my weapon,' " demonstrated an appreciation for the possibility that he would injure Lieutenant Hoffman in the event he retained the rifle. If he made the utterance *before* the weapon was taken away, his words reveal a fixed purpose to avert such a result. If *after*, as he contended at trial, the same words indicate his relief that he was rendered unable to effectuate such injury.

Under the circumstances of this case, we believe that the evidence is not sufficient to constitute the offense of communicating a threat.

## II

Next we consider the legality of an order from appellant's company commander to him to remove a silver bracelet he was wearing on his wrist.

Captain Mills, appellant's company commander, testified that on May 19, 1970, while his unit was securing Fire Support Base Veghel, he noticed that the appellant had a silver bracelet on his wrist. Mills stated he believed the wearing of such paraphernalia to be unauthorized. According to Captain Mills, the appellant simply stated, " 'I refuse, add it on to the rest of the charges.' " He did not explain why he did not want to take it off. Mills noticed that on May 25 the appellant still had it on. On cross-examination Captain Mills acknowledged that love beads around the neck, if they remain inside the shirt, are especially authorized, but not wrist bracelets. Captain Mills was aware that the appellant was serving his second tour in Vietnam and had been there about twenty months and that his primary duty station was on the line.

Sergeant Boles verified the Captain's order and the appellant's refusal. He described the bracelet as smaller than a wristwatch. The wearing of a wristwatch is authorized. Boles testified that either the beads the appellant wore or the bracelet was "sacred" to him. He could not recall whether the appellant attempted to tell the Captain that the bracelet was sacred.

The appellant testified that he has been wearing the bracelet since the beginning of 1968, and that no one had ever before told him to take it off. It was a gift from a three- or four-year-old Montagnard girl with whom he "became a true friend" after his patrol had helped the girl and her mother. The bracelet means "friendship or love." He has high respect for the Montagnards and "thought a lot of the bracelet and this is the reason that I kept it— I didn't want to take it off." The appellant also testified that he tried to explain to Captain Mills why he did not want to remove the bracelet, but "he just wouldn't listen."

In the early case of United States v Trani, 1 USCMA 293, 296, 3 CMR 27 (1952), this Court stated:

"It is a familiar and long-standing principle of military law that the command of a superior officer is clothed with a presumption of legality, and that the burden of establishing the converse devolves upon the defense. This rule is effectively stated in Winthrop, Military Law and Precedents, 2d ed, 1920, paragraph 888, as follows:

'The unlawfulness of the command must thus be a fact, and, in view of the general presumption of law in favor of the authority of military orders emanating from official superiors, the onus of establishing this fact will, in all cases—except where the order is palpably illegal on its face—devolve upon the defence, and clear and convincing evidence will be required to rebut the presumption.' "

See cases cited in Tedrow, Digest, Annotated and Digested Opinions, U. S.

Court of Military Appeals, Orders, Legality, pages 720–724.

With regard to the legality of particular orders, we held in United States v Martin, 1 USCMA 674, 676, 5 CMR 102 (1952):

". . . All activities which are reasonably necessary to safeguard and protect the morale, discipline and usefulness of the members of a command and are directly connected with the maintenance of good order in the services are subject to the control of the officers upon whom the responsibility of the command rests."

Cf. paragraph 169b, Manual, supra.

This Court has not been loath to hold illegal those orders which, upon inspection, were found to be arbitrary and capricious, overly broad in scope, or to impose an unjust limitation on a personal right. United States v Milldebrandt, 8 USCMA 635, 25 CMR 139 (1958); United States v Wysong, 9 USCMA 249, 26 CMR 29 (1958); United States v Nation, 9 USCMA 724, 26 CMR 504 (1958); United States v Wilson, 12 USCMA 165, 30 CMR 165 (1961); United States v Aycock, 15 USCMA 158, 35 CMR 130 (1964).

The battalion order, which Captain Mills stated served as the basis for his order, was not introduced at trial and we are, therefore, unaware of its precise contents. It would appear, however, that not all personal adornments were unauthorized since, according to Sergeant Boles, wristwatches were permitted. While a watch may be considered a necessary tool for a serviceman, love beads are obviously not, yet they were permitted to be worn around the neck if kept inside the shirt. Nevertheless, under these circumstances, we cannot say as a matter of law that the order was overly broad in scope or arbitrary or capricious. Was it then an unjust limitation on a personal right?

The appellant, at trial, was unable to state why he did not remove the bracelet when ordered to do so. He simply "didn't want to take it off" because it meant a lot to him. The Captain would not listen to his explanation.

It cannot be denied that the military has the authority to promulgate regulations or orders relative to proper dress. See United States v Yunque-Burgos, 3 USCMA 498, 13 CMR 54 (1953); United States v Crooks, 12 USCMA 677, 31 CMR 263 (1962); United States v Showalter, 15 USCMA 410, 35 CMR 382 (1965). Cf. United States v Jackson, 16 USCMA 509, 37 CMR 129 (1967), and AR 670–5, October 1, 1969.

Such being the case, we believe it was incumbent upon the defense at trial to produce some evidence that the order was beyond the scope of that authority. The evidence of record in this case is not sufficient to overcome the presumption of the legality of the order. United States v Trani, supra.

While we hold that the order of Additional Charge I is legal, that does not end the matter, for we believe that the evidence is insufficient to prove an offense alleged under Article 90, Uniform Code of Military Justice, 10 USC § 890.

Captain Mills testified that the wearing of the bracelet was "not authorized in the battalion. . . . I explained to him [the appellant] that it was not authorized to be worn first, and then I told him to take it off." In essence, the Captain acknowledged that he was simply telling the appellant to obey an existing battalion directive relative to matters of wearing apparel, a directive which he was duty bound to obey. Article 92(2), Code, supra, 10 USC § 892.

In United States v Bratcher, 18 USCMA 125, 126, 128, 39 CMR 125 (1969), where the accused was convicted of failing to obey a lawful command of his superior officer " 'to perform duties as a duty soldier, the duties to be performed to be assigned to him by the First Sergeant,' " we said that "an order to obey the law can have no validity beyond the limit of the ultimate offense committed."

540

In *Bratcher*, we set aside the conviction for failure to obey the command of the superior officer on the ground that that charge, having no efficacy beyond the charge of disobedience of the First Sergeant's order (for which Bratcher was also convicted), failed to state an offense.

In United States v Wilson, supra, the Government contended that an order not to drink liquor was not so broadly restrictive of private rights as to be arbitrary and illegal since it merely required that accused refrain from drinking while on duty and while in the barracks, the only two places he was authorized to be. In rejecting that contention, we said:

". . . If the order was as restricted as the Government contends, it was plainly unnecessary as regards drinking in billets because the consumption of liquor in the billets was already prohibited, and it is unlikely the squadron commander would order the accused to refrain from doing an act which was already forbidden to him." [*Id.*, at page 166.]

In the case at bar, since the Government's evidence showed that Captain Mills' command was predicated upon prohibitions stated in a battalion directive, the offense should have been brought under Article 92(2), Code, supra, the "ultimate offense committed." United States v Bratcher, supra, at page 128. The maximum punishment for such an offense is considerably less than for a violation of Article 90, Code, supra. See United States v Hofmiller, 12 USCMA 479, 31 CMR 65 (1961); United States v Hammock, 8 USCMA 245, 24 CMR 55 (1957); and footnote 5, paragraph 127c, Manual, supra. Cf. United States v Yunque-Burgos, supra, with United States v Showalter, supra.

Since, as noted, the battalion directive was not introduced at trial, the appellant's conviction cannot be sustained.

### III

The third issue relates to the failure of the staff judge advocate to inform the convening authority of the recommendations of officers in the chain of command regarding whether the appellant should be retained or eliminated from the service.

We need not detail the matter at length. Initially when only the charge of threatening Lieutenant Hoffman was being considered, the executive officer of the appellant's company,[1] the battalion commander, and the acting brigade commander all recommended that the appellant not be eliminated from the service. As charges multiplied the battalion and acting brigade commanders changed their recommendations. At all times, however, the executive officer has continued to adhere to his recommendation against elimination. In forwarding the charges to the convening authority, the staff judge advocate simply referred to the request of the Commanding Officer, 1st Brigade, "for trial by special court-martial authorized to adjudge a bad conduct discharge in the case of Private First Class Edwin L. Wartsbaugh." The post-trial review is silent in regard to this matter.

In United States v Rivera, 20 USCMA 6, 7, 42 CMR 198 (1970), we reversed and directed that a new post-trial review and action by the convening authority be prepared because of the failure of the staff judge advocate to inform the convening authority that the company commander had recommended that Rivera not be eliminated from the service. In *Rivera,* we said:

"It is at the level of the convening authority that an accused has his best opportunity for relief because of the former's broad powers which are not enjoyed by Courts of Military Review or even by this Court. United States v Wilson, 9 USCMA 223, 26 CMR 3 (1958). The convening authority has absolute

[1] The executive officer apparently acted in place of Captain Mills.

power to disapprove the findings and sentence, or any part thereof, for any or no reason, legal or otherwise. United States v Massey, 5 USCMA 514, 18 CMR 138 (1955); United States v Smith, 16 USCMA 274, 36 CMR 430 (1966). Because the convening authority can act for any or no reason, the staff judge advocate's review should include all *pertinent* matters. United States v Fields, . . . [9 USCMA 70, 25 CMR 332 (1958)]. The better the convening authority is informed the more fairly and justly will he exercise his discretion. United States v Foti, . . . [12 USCMA 303, 30 CMR 303 (1961)]."

See also United States v Boatner, 20 USCMA 376, 43 CMR 216 (1971); United States v Eller, 20 USCMA 401, 43 CMR 241 (1971).

We believe the same result should be reached in this case as in *Rivera*. The appellant has been in ██ the military service since August 1966, having received an honorable discharge on October 28, 1967, and reenlisting the next day. He served in Vietnam from February 1967 to September 1968, nine months on the line and ten months as a combat military policeman. His combat speciality is that of a light weapons infantryman. He returned to Vietnam in August 1969, and was a rifleman throughout his second tour. Except for two ratings of good, his conduct and efficiency ratings have all been excellent. According to the staff judge advocate's post-trial review, the appellant "had seen a 'lot of contact' (R 128) during his two tours in Vietnam." He was appointed as assistant squad leader just prior to his trial. In November 1969, the appellant was evacuated to Japan for a month because of a perforated eardrum caused by the back-blast of a claymore mine. He is entitled to wear the National Defense Service Medal, Vietnam Service Medal, Combat Infantryman Badge (awarded twice), Vietnam Campaign Medal, three overseas bars, and the Army Commendation Medal. At a post-trial interview, the appellant expressed a desire to be restored to duty.

Under these circumstances, we believe the executive officer's recommendation is pertinent and that a new post-trial advice and action by the convening authority is warranted. United States v Rivera, supra.

That portion of the decision of the Court of Military Review affirming the appellant's conviction of specification 2 of the Charge and the Charge and Additional Charge I and its specification is reversed and these specifications and Charges are ordered dismissed. The sentence is set aside. The record of trial is returned to the Judge Advocate General of the Army for a new post-trial review and action by the convening authority on the remaining findings of guilty.

Judge QUINN concurs.

DARDEN, Chief Judge (dissenting):

As the principal opinion indicates, Captain Mills explained to the accused that the wearing of a bracelet was unauthorized and ordered him to remove it. Accused replied, " 'I refuse, add it on to the rest of the charges.' " Accused testified that he did not wish to remove the bracelet and attempted to explain his reasons to Mills, who would not listen.

The wearing of such items was also prohibited by a separate battalion order.

From the foregoing, it is apparent that the accused himself concedes he received a direct and understandable order from his superior officer, Captain Mills, to remove a bracelet which formed no part of his military uniform and that he deliberately refused to obey it. In my opinion, these circumstances make out a violation of Article 90, Uniform Code of Military Justice, 10 USC § 890.

The majority opinion agrees that the order was legal as a part of the undoubted authority of the armed forces to require conformity to a prescribed mode of dress but regards it as

nothing more than a direction to comply with the battalion order. See United States v Bratcher, 18 USCMA 125, 39 CMR 125 (1969), and United States v Wilson, 12 USCMA 165, 30 CMR 165 (1961). I believe the principles set forth in those cases are distinguishable.

In *Bratcher,* supra, the order was to perform duty as a duty soldier, the duties to be assigned to the accused by his first sergeant. In holding that the order did not require Bratcher to perform a specific act, we declared that the order "in effect told the accused to obey the injunctions of Article 90 and 91 of the Code. . . . [and] was only an exhortation to the accused to do his duty as a soldier." (18 USCMA, at page 128.) In *Wilson,* supra, the Court held an order prohibiting the accused from using alcoholic beverages to be illegal. Faced with the Government's argument that the directive applied only to accused's drinking while on duty or in his barracks, the Court decided that the attempt so to restrict the scope of the order was unwarranted, as the commander was unlikely to have ordered the accused to refrain from doing that which was already forbidden by another order.

Here, we consider not a general injunction to perform as a duty soldier but a specific directive issued by a superior to a subordinate, requiring him to perform a designated act.

Moreover, the record establishes that this order, limited in scope, was given in contrast to the contingency found "unlikely" in *Wilson,* supra. Although wearing the bracelet apparently also violated the battalion order, Captain Mills sought compliance with that order by placing the force of his status as an officer behind it and directing the accused at once to remove the item from his wrist. The order "was a specific command given directly to the accused by his superior officer. Accused's refusal to obey was deliberate and belligerent and his reply was couched in language of certainty." United States v Stout, 1 USCMA 639, 643, 5 CMR 67 (1952). See also my dissenting opinion in United States v Nixon, 21 USCMA 480, 45 CMR 254 (1972). I would therefore conclude that the evidence is sufficient to support the findings of guilty of willful disobedience.

For the reasons set forth in my dissenting opinion in United States v Rivera, 20 USCMA 6, 42 CMR 198 (1970), I also believe a new post-trial review is not warranted because of the omission of the executive officer's pretrial recommendation that accused be retained in the service.

I would return the case to the Court of Military Review for reassessment of the sentence in light of disapproval of the charge of communication of a threat.