UNITED STATES, Appellee,

v.

**Keith J. PETTERSEN, Airman First Class, U.S. Air Force, Appellant.**

No. 44569.

ACM S25582.

U.S. Court of Military Appeals.

Dec. 12, 1983.

1. A charge of communicating a threat, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934, was dismissed by the military judge.

For Appellant: *Major Richard A. Morgan* (argued); *Colonel George R. Stevens* (on brief); *Colonel Leo L. Sergi.*

For Appellee: *Major Michael J. Hoover* (argued); *Colonel Kenneth R. Rengert* (on brief).

*Opinion of the Court*

COOK, Judge:

Pursuant to his pleas, a special court-martial, military judge alone, convicted the accused of absence without leave for four days; violation of a lawful general regulation; and willfully disobeying the lawful order of his superior noncommissioned officer, in violation of Articles 86, 92, and 91, Uniform Code of Military Justice, 10 U.S.C. §§ 886, 892, and 891, respectively.[1] The approved sentence extends to a bad-conduct discharge, confinement at hard labor for 4 months, forfeiture of $367.00 pay per month for 4 months, and reduction to Airman Basic (E–1). The United States Air Force Court of Military Review affirmed the findings and sentence, after giving credit for illegal pretrial confinement. 14 M.J. 608 (1982).

This Court granted accused's petition for review of the following issue:

WAS THE AIR FORCE COURT OF MILITARY REVIEW CORRECT IN HOLDING, CONTRARY TO *UNITED STATES V. CHRONISTER,* 8 M.J. 533 (N.C.M.R.1979) AND *UNITED STATES V. BRATCHER,* 19 U.S.C.M.A. 125, 39 C.M.R. 125 (1969),[2] THAT A PERSON IN AN UNAUTHORIZED ABSENCE STATUS WHO REFUSES AN ORDER TO RETURN TO HIS DUTY STATION MAY BE BOTH CONVICTED AND SEPARATELY PUNISHED FOR DISOBEDIENCE OF THE ORDER AND HIS AWOL OFFENSE?

2. The citation to *United States v. Bratcher* should read: 18 U.S.C.M.A. 125, 39 C.M.R. 125 (1969). In fairness to counsel, we note that this is a printing error in both the U.S.C.M.A. and C.M.R. reports.

Under the facts of this case, we affirm the decision below, because we agree that the accused can be both convicted and separately punished for disobedience of the order and his AWOL offense.

The accused absented himself from his organization on January 21, 1982. The following day, his First Sergeant, Master Sergeant Shonk, and his duty supervisor, Technical Sergeant Peterson, went to the accused's off-base residence. There, after knocking on the door and having it opened to them by the accused, Sergeant Shonk "asked . . . [the accused] if he was ready to return to work," and the accused responded, "no." Sergeant Shonk asked the accused if he and Sergeant Peterson "could come in," and the accused "opened the door wider . . . permitting . . . [both sergeants] to enter the house." Sergeant Shonk then asked the accused "what his intentions were" and the accused indicated that "he needed more time to get his personal affairs together, and . . . he had no intention of returning to the base." Sergeant Shonk told the accused "that he was officially absent without leave, and . . . [Sergeant Shonk] wanted to make certain . . . [accused] understood exactly what his status was at . . . [that] given time." Sergeant Shonk then "repeated the statement to . . . [the accused], and asked him if he understood that he, in fact, was AWOL, [to] which . . . [accused responded,] 'yes.'" After making sure the accused understood his AWOL status, Sergeant Shonk "told . . . [accused] that, as his first sergeant, . . . [he] was officially ordering . . . [accused] to accompany . . . [Sergeants Shonk and Peterson] back to the base." [3] To this order, the accused responded, "I refuse." The order to return was repeated twice more, at which time the accused stated: "I'm tired of taking orders, and if I receive one more order, somebody's going to get hurt." Sergeant Shonk testified that, at that point, his

> first thought was for the safety of Tech Sergeant Peterson . . . [who] had accompanied . . . [him] to . . . [the] house, and . . . [he] perceived . . . [accused's] statement as a threat, and . . . [he] could foresee possibly . . . [accused] having someone else in the house with him, and in the event there were a scuffle or . . . [Shonk] physically . . . [tried] to apprehend . . . [accused], someone else . . . [might] come to his aid, and just . . . the atmosphere and environment of the house [were such that], . . . [Shonk] could . . . [envision] someone behind a closed door, possibly armed with a shotgun.

Fearing for their safety, the two sergeants left the house, and the accused remained in an unauthorized absence status for two additional days.

Appellate defense counsel argue: "As the appellant already had a duty to return to his organization, in uniform, the order to merely obey that requirement can have no validity beyond the limit of the ultimate offense committed, AWOL." [4] To the contrary, the Government argues that the orders were legitimately given to terminate the accused's unauthorized absence status for his own, as well as his organization's, benefit, and that they were not given merely to increase the potential punishment which the accused might face.

---

**3.** Although there is some variance in testimony as to the exact words of the orders and whether they were given twice or three times, the testimony of Sergeants Shonk and Peterson and the accused is essentially consistent as to their wording. The accused offered a different version of his final response, in contradiction to the sergeants.

**4.** Intellectually, this represents an example of "closed-loop logic" which goes like this: The order, to be legal, must relate to a military duty, which, by definition, the accused is already obligated to perform by virtue of his military status. The sole purpose of the order is to add strength to the pre-existing duty by the direct immediate authority of the superior in order to secure compliance. One aspect of the superior's authority is the ability to punish noncompliance more severely than would be possible under the pre-existing obligation. Thus, in this sense, the reason for giving the order is to secure performance of the existing duty at penalty of enhanced punishment. Thus, if the defense argument were carried to its logical end, it would eliminate enforcement of most military orders, a condition that no military organization could tolerate.

In *United States v. Bratcher,* 18 U.S.C. M.A. 125, 39 C.M.R. 125 (1969), the accused refused to perform military duties and was taken before his commander, who "ordered him to work as a duty soldier and perform those duties assigned to him by the First Sergeant." *Id.* at 126, 39 C.M.R. at 126. The accused expressly refused to obey the order. Subsequently, he was tried for, among other things, violating that order. In reversing a conviction of the charge, we held:

> The specifications and the stipulation in the case at bar make it crystal clear that the order did not contemplate performance or nonperformance of some *special function* but rather it was an order that the accused was to perform his duties as a soldier by obeying his superiors, an obligation he was already under by reason of his status as a soldier and as a subordinate to the Captain and the First Sergeant.

*Id.* at 128, 39 C.M.R. at 128.

In *United States v. Chronister,* 8 M.J. 533 (1979), the United States Navy Court of Military Review held "that a person in an unauthorized absentee status who" refused to obey the order of a superior commissioned officer to return to the ship could be convicted of willful disobedience of that order, but that conviction could not be used to "escalate the punishment to which an accused otherwise would be subject." *Id.* at 534.

Paragraph 170*a*, Manual for Courts-Martial, United States, 1969 (Revised edition), in discussing the offense of insubordinate conduct toward a noncommissioned officer, states:

> Article 91 has the same general objects with respect to ... noncommissioned officers ... as Articles 89 and 90 have with respect to commissioned officers, namely, to insure obedience to their lawful orders.

Paragraph 169*b*, in discussing the offense of disobeying a superior commissioned officer, states:

> The willful disobedience contemplated is such as shows an intentional defiance of authority, as when an enlisted person

is given a lawful command by a commissioned officer to do or cease doing a particular thing at once and refuses or deliberately omits to do what is ordered.

> The order must relate to military duty and be one which the superior commissioned officer is authorized under the circumstances to give the accused. Disobedience of an order which has for its sole object the attainment of some private end, or which is given for the sole purpose of increasing the penalty for an offense which it is expected the accused may commit, is not punishable under this article.

In essence, the Manual contemplates the giving of an order which relates to a military duty presumably already imposed by some other source of authority, and which is given under circumstances which negate the motive of increasing punishment for not performing the pre-existing duty. The duty sought to be enforced by the issuance of a personal order may not be a "mere routine duty," the violation of which may be tried only under Article 92 or 134 of the Code, but not under Article 90. Para. 169*b*, Manual, *supra.*

The difficulty in applying these concepts in a given situation is obvious. In *United States v. Bratcher, supra,* we set aside the conviction of willfully disobeying the order because the order was essentially only to obey the law, a duty which was already imposed upon the accused by virtue of his military status.

In *United States v. Wartsbaugh,* 21 U.S. C.M.A. 535, 45 C.M.R. 309 (1972), an order to remove a bracelet which merely enforced a pre-existing battalion order was held to be properly chargeable under Article 92, rather than Article 90. In both cases, we looked to the "ultimate offense committed." *Id.* at 541, 45 C.M.R. at 315, *citing United States v. Bratcher, supra* at 128, 39 C.M.R. at 128.

Our concern has been "that the giving of an order, and the subsequent disobedience of same, not be permitted thereby to escalate the *punishment* to which an accused

otherwise would be subject for the ultimate offense involved." *United States v. Quarles,* 1 M.J. 231, 232 (C.M.A.1975). However, we have elsewhere recognized "that a superior officer may, by supporting a routine duty with the full authority of his office, lift it above the common ruck—and thus remove the failure to perform it from within the ambit of Article 86(1)," UCMJ, 10 U.S.C. § 886. *United States v. Loos,* 4 U.S.C.M.A. 478, 480–81, 16 C.M.R. 52, 54–55 (1954).

It is undeniable here that the accused was obligated to return to his unit and perform his military duties.[5] On the other hand, he had indicated his intent not to accede to these duties even at the request of his superior noncommissioned officers. The issuance of a direct order to return to the base clearly was within the legal authority of Master Sergeant Shonk and represented a measured attempt to secure compliance with those pre-existing obligations.[6] There is no evidence of any intent to issue the orders for the purpose of increasing the potential punishment of the accused; instead, it is clear that they were issued in the performance of a proper military function—to secure the return of the accused to duty. The accused's express defiance of the orders and his intention to remain in unauthorized absence status amounts to "a direct attack on the integrity of any military system." *United States v. Nixon,* 21 U.S.C.M.A. 480, 486, 45 C.M.R. 254, 260 (1972) (Darden, C.J., dissenting). While we must insure that the use of orders is not improperly designed to increase punishment in a given instance, we also must not erode the command structure upon which the military organization is based.[7] The accused's direct defiance of the orders and refusal to return to his unit strikes at the very essence of military order and discipline and cannot be condoned. Such defiance, under the facts of this case, constitutes "the ultimate offense committed" and, as such, is separably chargeable and separably punishable from the absence without leave which had not then been terminated.

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge EVERETT and Judge FLETCHER concur.

---

5. The deleterious effect on the military mission of the absence without leave of service personnel is beyond cavil. The fact that the two sergeants went to the accused's house to attempt to secure his return gives some indication of the importance assigned by the unit to his absence.

6. The accused was surprised that only the two sergeants came to his house.

> If I was going to go to somebody's house that was AWOL—two people's house that was AWOL, I would go with the Security Police, and I thought he would show up with the police.

This may give some indication of the accused's state of mind concerning military authority.

7. Unless we reach the conclusion that the accused may be punished separately for willful disobedience, the noncommissioned officer had the practical alternatives of letting the absence continue indefinitely or of apprehending the accused. Generally, we seek to use moral force as a substitute for physical force. It does not take much imagination to conceive of situations where an order to comply with military directives must be considered separately from the act of not complying. For example, if a superior comes upon two military persons engaged in a brawl and orders them to stop fighting, their refusal to comply with his order is separate from their own obligation not to commit assault and battery or to be disorderly in command. Military discipline requires separate punishment of the disobedience. That the accused would, presumably, have returned to the base had the sergeants been accompanied by security policemen discloses his lack of respect for the peaceable imposition of military discipline through the use of command authority. This lack of respect cannot be tolerated.