UNITED STATES

v.

**Randal K. ORTON, Private First Class (E–2), U.S. Marine Corps.**

**NMCM 200000891.**

U.S. Navy–Marine Corps Court
of Criminal Appeals.

Sentence Adjudged 22 July 1999.

Decided 7 Feb. 2002.

LCDR Robert D. Evans, Jr., JAGC, USNR, Appellate Defense Counsel.

LT Amanda A. St. Claire, JAGC, USNR, Appellate Defense Counsel.

LT C.J. Gramiccioni, JAGC, USNR, Appellate Government Counsel.

Before ANDERSON, Senior Judge, VILLEMEZ, and BRYANT, Appellate Military Judges.

ANDERSON, Senior Judge:

A military judge, sitting as a special court-martial, convicted the appellant, pursuant to his pleas, of unauthorized absence and willful disobedience of the order of a superior com-

missioned officer in violation of Articles 86 and 90, Uniform Code of Military Justice, 10 U.S.C. §§ 886 and 890. The appellant was sentenced to confinement for 110 days, forfeiture of $639 pay per month for 4 months, reduction to pay grade E–1, and a bad-conduct discharge. The convening authority approved the sentence as adjudged, but suspended all confinement in excess of 45 days in accordance with a pretrial agreement.

After carefully considering the record of trial, the appellant's assignment of error, and the Government's response, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. *See* Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(6).

## Willful Disobedience of an Order

### a. Issue

The appellant contends that the order he pleaded guilty to disobeying did not constitute a lawful order because it was not a specific mandate to do or not to do a specific act. At issue is whether a question can be a positive command.

### b. Facts

At trial, the appellant pleaded guilty to willfully disobeying the order of Second Lieutenant [2ndLt] Watson, USMC, "to join his company in the field for a training evolution, or words to that effect." Charge Sheet. During the providence inquiry, the appellant made the following admissions in response to questions from the military judge:

MJ: What happened with [2ndLt Watson] on the 17th of May that makes you think you're guilty of this offense?

ACC: I refused a direct order to train, starting with my squad leader, sir, and moving on up the chain of command up to my First Sergeant, sir. And when I reached him, they told me that I wasn't going to the field and that I would be doing working parties. But Lieutenant Watson asked me if I was ready to train, and I said "No," sir. I said "No." And that was when I refused the direct order, sir.

. . . .

MJ: So at some point [2ndLT Watson] comes up to you—well, did you get the sense he was telling you, maybe not in so many words, but he was telling you that he wanted you to go out to the field and train?

ACC: Yes, sir. I was—not necessarily train. I was on limited duty at the time. But gear watch or radio watch. They just wanted my presence in the field.

MJ: . . . Okay. Because I think the words you used to me before was he said "Are you ready to train," or "Are you ready to go to the field?" Was that it? Or what do you recall from the conversation?

ACC: It was real brief, sir. They had just—once I refused to train to my squad leader and platoon guide, the Staff Sergeant, they just—they knew I had refused to train. And just as part of the process, I suppose, sir, they brought me to the platoon commander's hooch and told him what happened. And he just came up to me and said, "So are you ready to go to the field," in so many words that is what he said, I believe, sir. I don't remember exactly but—

MJ: What did you say?

ACC: "No," sir.

MJ: Did you interpret what he was saying to you as a—well, did you think he was ordering you to the field?

ACC: Yes, sir.

MJ: It strikes me as what the unit was doing was putting the weight of a commissioned officer behind the order that you had already received from a staff noncommissioned officer. Is that right?

ACC: Yes, sir.

. . . .

MJ: So you're not sure of the exact words, but it was something to the effect of "Are you ready to go out to the field now," or something like that?

ACC: Yes, sir. It was asking me to go with them to the field, sir.

MJ: Okay.

ACC: And I knew that.

MJ: Okay. All right. Okay. So regardless of the exact words that Lieutenant Watson used to you, you interpreted what he was saying to you as a command?

ACC: Yes, sir.

MJ: That you, PFC Orton, were going to go to the field?

ACC: Yes, sir.

MJ: And in response you said what, or did what?

ACC: "No," sir.

MJ: And did you go to the field?

ACC: No, sir.

. . . .

MJ: Did you know he was giving you an order?

ACC: Yes, sir.

MJ: The order, as you understand it, was go with the field—go join the field—or rather the company in the field, right?

ACC: Yes, sir.

MJ: Okay. And your response was to disobey that command?

ACC: Yes, sir.

. . . .

MJ: Well, under all the circumstances, as they existed at the time, could you have obeyed the Lieutenant and gone out to the field with the company?

ACC: Yes, sir. Not to train but to do radio watch or gear watch, sir.

MJ: Okay. And did you understand that that is what he was telling you to do?

ACC: Yes, sir.

MJ: It strikes me that the way you phrased it, though, it was more a question than a command. Or is it—or are you confident that what the Lieutenant was doing was not giving you a question, but giving you a command?

ACC: I'm positive, sir.

MJ: Okay. What was it? Was there something about the way he said it or was it his tone or what?

ACC: He was more—he was in a—not a hurry to say it, but they were getting ready to make evolution to the field, and they didn't have time to put up with me. An he was like, "Well, Orton, are you going or not? Are you going to come to the field with us or not?" And I was like, "No, sir."

. . . .

MJ: I told you earlier that the form of the command is not what's important necessarily, as long as it's clearly a command to do or to stop doing something, and that you interpret it as such. Now, you're confident that what the Lieutenant was saying based upon the way he said it and the surrounding context was "You're going to the field"?

ACC: Yes, sir.

MJ: Or he was ordering you to go to the field?

ACC: Yes, sir.

MJ: No doubt in your mind about that?

ACC: No doubt, sir.

MJ: And you interpreted what he was saying and the way he was saying it as an order, that is, a command, for you to go to the field with the company?

ACC: Yes, sir.

MJ: And you intentionally chose to disobey that order. Is that right?

ACC: Yes, sir.

MJ: Okay. Was there any other language that he communicated to you during the course of this?

ACC: No, sir.

MJ: Was it sort of a hurried, "Well, we're going to the field. Are you ready to go or not"? Something like that?

ACC: Yes, sir. It was a direct order, sir, and I refused it. The day before they went to the field, I was told, you know, I was going. And I had planned to refuse to go. I was perfectly well aware of what I was going to do was to disobey a direct order and refuse to go to the field, sir.

. . . .

MJ: Yeah. Okay. Lieutenant Watson never said to you "Orton, pack your trash or get your gear. You're going to the field." He didn't make it emphatic like that, did he?

ACC: No, sir.

MJ: But you understood that implicit in what he was saying to you was "You're going to the field"? Is that what I'm hearing from you?

ACC: Yes, sir.

MJ: All right. And when you said "No" in response to his question, what you were intending was to defy him in his capacity as a commissioned officer, right?

ACC: To refuse to train, sir.

MJ: All right. Again, the reason this is a separate offense from any other orders violation is because of the direct, intentional defiance. Was it your intent at the moment in time to defy the Lieutenant, the one who was giving you this order?

ACC: Yes, sir.

Record at 19–27.

#### c. Discussion

■ An order must be "a specific mandate to do or not to do a specific act" in order for it to impose a duty to obey. MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), Part IV, ¶ 14c(2)(d). "As long as the order is understandable, the form of the order is immaterial, as is the method by which it is transmitted." MCM, Part IV, ¶ 14c(2)(c). *See United States v. Warren*, 13 M.J. 160, 161 (C.M.A.1982); *United States v. Mitchell*, 6 C.M.A. 579, 582, 20 C.M.R. 295, 297, 1955 WL 3569 (1955); *United States v. Glaze*, 3 C.M.A. 168, 173, 11 C.M.R. 168, 173, 1953 WL 1998 (1953). It may be "delivered orally, or in writing, or by signal." *United States v. McLaughlin*, 14 M.J. 908, 910 (N.M.C.M.R. 1982). When a communication is a mere suggestion or request or when it is equivocal, uncertain, or speculative, it will not suffice to constitute an order. *United States v. Green*, 13 C.M.R. 673, 675, 1953 WL 2536 (A.F.B.R. 1953); *United States v. Pauley*, 3 C.M.R. 827, 829, 1952 WL 2046 (A.F.B.R.1952).

"[T]he nature of the communication and the circumstances surrounding it" determine whether it is an order. *McLaughlin*, 14 M.J. at 911. If the communication lacks specificity of meaning, "[e]vidence of the understanding of the parties is ... material to [a] determination of the nature of the communication." *United States v. Johnson*, 17 C.M.A. 514, 517, 38 C.M.R. 312, 315, 1968 WL 5405 (1968). *See Mitchell*, 6 C.M.A. at 582, 20 C.M.R. at 297.

■ The standard for review to determine whether a plea is provident is whether the record reveals a substantial basis in law and fact for rejecting it. *United States v. Prater*, 32 M.J. 433, 436 (C.M.A.1991). Applying this standard to the pleas in this case, we find no basis in law or fact for rejecting the guilty pleas to violating the order of a superior commissioned officer.

■ By his own admission, the appellant received an order from his enlisted chain of command to go to the field to train.[1] When he failed to comply, he was brought before his platoon commander, 2ndLt Watson, who ostensibly was to repeat the order to the appellant to bolster the persuasiveness of the initial command.[2] *See United States v. Pettersen*, 17 M.J. 69, 72 (C.M.A.1983) (upholding direct order that "represented a measured attempt to secure compliance with ... pre-existing obligations"). Instead of explicitly ordering him to go to the field to train, however, 2ndLt Watson implicitly did so with a question: "So are you ready to go to the field?" Record at 21. Despite the form of

---

1. A general instruction to train does not constitute an order for the purposes of Articles 90 and 91, UCMJ, 10 U.S.C. §§ 890 and 891, if it is only an exhortation to do one's pre-existing duty as a serviceman. MCM, Part IV, ¶ 14c(2)(d); *United States v. Bratcher*, 18 C.M.A. 125, 128, 39 C.M.R. 125, 128, 1969 WL 5928 (1969); *United States v. Beattie*, 17 M.J. 537, 538–39 (A.C.M.R.1983). If, however, the instruction to train contains a mandate to do a specific thing at a specific time, then it constitutes an order. *Beattie*, 17 M.J. at 539; *see United States v. Loos*, 4 C.M.A. 478, 480, 16 C.M.R. 52, 54, 1954 WL 2427 (1954)("It is undeniable that a superior officer may, by supporting a *routine duty with the full authority of his office,* lift it above the common ruck....").

2. Repeated personal orders, intended to motivate the appellant to willingly perform rather than to increase the maximum punishment, are proper and may be separately charged, but not separately punished. *United States v. Bethea*, 2 M.J. 892, 894–95 (A.C.M.R.1976); *United States v. Simpson*, 42 C.M.R. 683, 685, 1970 WL 7200 (A.C.M.R.1970); *United States v. White*, 40 C.M.R. 686, 687–90, 1969 WL 6173 (A.B.R. 1969); *United States v. Tiggs*, 40 C.M.R. 352, 353–54, 1968 WL 5478 (A.B.R.1968); *United States v. Bivins*, 34 C.M.R. 527, 529–30, 1964 WL 5066 (A.B.R.1964).

2ndLt Watson's words, the appellant positively understood this interrogatory to be a command to go to the field.[3] He confirmed this understanding several times under repeated questioning by the military judge, admitting that the meaning was implicit in the question. Under these circumstances, we find that the question amounted to a positive command. Where a question is interpreted by its recipient as a specific mandate to do a specific act or by its context could be interpreted in no other way, it constitutes an order.[4] *See* MCM, Part IV, ¶¶ 14c(2)(c) and 14c(2)(d).

3. Although the appellant at one point in the providence inquiry described the question from 2ndLt Watson as "Are you going to come to the field with us or not?", he interpreted it not as a choice of action, but as a direct order. Record at 24. *See Green,* 13 C.M.R. at 675 (reversing an order's violation where the "order" could have been interpreted to give the accused "a choice of action, an election or option.").

4. Of course, an explicit order is often preferable to an implicit one and eliminates the problem of misinterpretation. As noted in the foreword to the Marine Corps' *Commander's Tactical Handbook,* leaders must remember to "[m]ake their orders concise, clear, and simple" and "[g]ive subordinates a thorough understanding of the intent." Marine Corps Reference Publication 3–11.1A. In this regard, we note that one reason offered for the Confederate defeat at the Battle of Gettysburg is that General Ewell interpreted a communication by General Lee as a "suggestion" rather than an order because General Lee used the phrase "if practicable":

> The second reason for the Confederate defeat manifestly was the failure of Ewell to take Cemetery Hill when Lee suggested, after the Federal defeat on the afternoon of July 1, that he attack it. Had Ewell thrown Early forward, without waiting for Johnson, he probably could have taken the hill at any time prior to 4 p.m. or perhaps 4:30. Ewell hesitated because he was unfamiliar with Lee's method and had been trained in a different school of command. Jackson, who had always directed Ewell's operations, had been uniformly explicit in his orders and never allowed discretion unless compelled to do so; Lee always trusted the tactical judgment of his principal subordinates unless he had to be peremptory. Ewell, moreover, was of a temperament to take counsel, and was puzzled and embarrassed when told to capture Cemetery Hill "if practicable." Lee could not be expected to change his system for Ewell, nor could Ewell be expected to change his nature after only two months under Lee.

Douglas S. Freeman, *Why Was Gettysburg Lost?* in Lee The Soldier 455–56 (Gary W. Gallagher ed., Univ. of Nebraska Press 1996).

## Conclusion

Accordingly, we affirm the findings of guilty and sentence as approved on review below.

Judge VILLEMEZ and Judge BRYANT concur.