UNITED STATES, Appellee

v

JIMMIE L. AYCOCK, Airman First Class,
U. S. Air Force, Appellant

15 USCMA 158, 35 CMR 130

No. 17,794

December 4, 1964

*Lieutenant Colonel Andrew S. Horton* argued the cause for Appellant, Accused. With him on the brief were *Colonel Robert O. Rollman* and *Colonel Daniel E. Henderson, Jr.*

*Colonel Emanuel Lewis* argued the cause for Appellee, United States. With him on the brief was *Captain V. Rock Grundman, Jr.*

## Opinion of the Court

FERGUSON, Judge:

Tried by a special court-martial convened at Malmstrom Air Force Base, Montana, the accused, pursuant to his pleas, was found guilty of adultery, in violation of Uniform Code of Military Justice, Article 134, 10 USC § 934, and two specifications of failure to obey a lawful order, in violation of Code, supra, Article 92, 10 USC § 892. He was sentenced to bad-conduct discharge, confinement at hard labor for three months, and reduction to the grade of Airman Basic. Intermediate appellate authorities affirmed, and we granted accused's petition for review upon his claim that:

"THE . . . PLEA OF GUILTY TO THE ADDITIONAL CHARGE AND ITS SPECIFICATIONS WAS IMPROVIDENT."

The granted issue deals with the charges of failure to obey a lawful order, which were preferred, referred to

trial, and served on the accused on the very day he pleaded guilty thereto, albeit his consent to an immediate hearing is expressly set forth in the record. As, however, the alleged disobedience peripherally involves the separate charge of adultery, it is necessary to refer to the entire factual background of the case in order to place the question which we must decide in proper perspective.

Airman Aycock pleaded guilty to committing adultery with a Mrs. D, the wife of a fellow airman living in Great Falls, Montana. From stipulated proof, it appears that on November 9, 1963, such act occurred between the parties at the D's home while Airman D was intoxicated and unconscious. It was further stipulated that accused's commanding officer, on November 20, 1963, ordered accused "not to contact Airman . . . D—— or his wife . . . . I told him I did not want him to intimidate or harass the D——s or discuss the case with them at any time prior to the trial." At this time, accused and Airman D were both working in the orderly room of their organization. According to the commander's testimony, the sole exception made in the order was in reference to contacts between the airmen concerning official business in the orderly room. The reasons for the order were that the commander "had had a complaint that he had contacted Airman D—— or his wife and he was bothering them and requesting that they drop the charges," and, during a previous trial of the accused for adultery—unconnected with the incident with which we are now concerned—there had been "complaints from the witnesses . . . that he had threatened them unless they dropped the charges."

Having received such order, the accused, on November 21, 1963, approached Airman D "at work." According to the stipulation of D's testimony, Aycock "started to talk to me about the charge that was pending against him as a result of my wife's complaint. In essence, he wanted me to drop the charges against him." On November 22, 1963, Aycock called Mrs. D and, according to her testimony,

"talked to me for sometime about the charges that I had brought against him. The general theme of his conversation was a request to me to drop the charges against him."

As a result of these conversations with the D's, accused was charged, in two specifications, with having disobeyed the lawful order of his commanding officer "not to contact Airman . . . D—— [or Mrs. D] about any matters concerning the charges pending against him." The providence of his pleas of guilty to these counts essentially depends upon the legality of the commander's directive, as thus alleged and proved.

In United States v Wysong, 9 USCMA 249, 26 CMR 29, the Court was confronted with a similar, albeit broader, order. There, an investigation was being conducted into various allegations of misconduct on the part of accused's wife and stepdaughter with members of his organization. Efforts on the part of the accused to impede the investigation by interrogating and threatening persons called to appear as witnesses came to the attention of his commanding officer. He ordered the accused "'not to talk to or speak with any of the men in the company concerned with this investigation except in line of duty.'" Thereafter, accused talked to several members of the company about their proposed testimony. Based on such facts, he was charged with and found guilty of disobeying the order. Finding the directive "so broad in nature and all-inclusive in scope as to render it illegal," we set aside the findings of guilty. In so holding, we declared, at page 251:

"We are not to be understood as intimating in any manner that an order of the type here sought to be employed could never attain the status of a legal order so as to make its violation the subject of a criminal action. If the order had been narrowly and tightly drawn and was 'so worded as to make it specific, definite, and certain' it might well have been sufficient to support a conviction. United States v Milldebrandt, 8 USCMA 635, 25 CMR 139. While

**159**

we fully appreciate the purpose sought to be achieved by the issuance of this order, we cannot place our seal of approval upon an order which is so broad as to practically prevent all speech—except in line of duty—regardless of the laudable motives intended."

Indeed, the Government seizes upon the quoted language and urges that it supports the legality of the order issued here, declaring that it was limited to contacts with Airman D and his wife, dealt with the subject of the charge of adultery which had been placed against the accused, and thus, under our declaration in United States v Wysong, supra, was "narrowly and tightly drawn." The difficulty with this position is that, unlike *Wysong*, which initially involved only allegations of misconduct on the part of accused's wife and stepdaughter, the situation now before us involves a positive direction to an accused not to contact the only two witnesses to a charge *against* him. Thus, it is precisely the factors which cause the Government to denominate the order as narrow and limited which lead us to believe that, on its face, it is illegal and unenforceable.

In United States v Tellier, 13 USCMA 323, 32 CMR 323, we pointed out the basic right of a military accused to prepare for trial on the charges alleged against him. We quoted with approval the statement in Commonwealth v O'Keefe, 298 Pa 169, 148 Atl 73, at page 74, that "It is vain to give the accused a day in court, with no opportunity to prepare for it." While we dealt there with the right to the services of appointed counsel during both the pretrial and trial phases of a case, the principle is equally valid when applied to the situation here depicted.

An accused and his counsel are entitled to ample opportunity to prepare his defense, "including opportunities to interview each other and any other person." Manual for Courts-Martial, United States, 1951, paragraph 48*g*. An order which prohibits such contacts with the witnesses against him is un-

lawful. While the Air Force "is clearly authorized to issue orders . . . , it may not perversely use this authority" to hamper an accused in military justice proceedings. United States v Acfalle, 12 USCMA 465, 31 CMR 51, at page 469; 23 CJS, Criminal Law, § 958. The applicable principle has been well stated by many authorities.

In Walker v Superior Court, 155 Cal App 2d 134, 317 P2d 130 (1957), when it appeared that a witness against the defendant had been directed by the sheriff " 'not to converse, discuss, or mention anything pertaining to the case' " with the defense, the court declared, at page 134:

". . . [W]e do not think that the prosecution or the sheriff may order a witness not to talk to the defendant or his counsel. Diaz has refused to talk only because the sheriff ordered him not to and we are of the opinion that it would be proper for the court to entertain a motion to compel the sheriff to annul his order to Diaz. Of course, Diaz did not have to obey the order of the sheriff but as a practical matter such an order can be, and was here shown to be, an effective way of keeping a witness's mouth closed. Since the order came from a person connected with the state, we are of the opinion that a court can and should order that person to cease interfering with defense counsel's right to interview a witness."

In Schindler v Superior Court, 161 Cal App 2d 513, 327 P2d 68 (1958), a pathologist refused to discuss his autopsy findings with the defendants on the ground that he had been instructed by the district attorney not to do so. Referring to Walker v Superior Court, supra, Justice Warne declared, "The language there is applicable in the instant cases and the court should have ordered the district attorney to cease interfering with the defense counsel's right to interview witnesses." Schindler v Superior Court, supra, at page 74.

In Wisniewski v State, 1 Storey (51 Del) 84, 138 A2d 333 (1957), a police officer involved in the case was in-

structed not to discuss the case with defendant's counsel. In holding such improper, the Supreme Court of Delaware stated, at page 338:

". . . Of what avail is the defendant's right to use compulsory process for the attendance of a witness if the defendant may not discuss with a witness in advance, the facts within the witness' knowledge? We think defendant's counsel had this right. State v Papa, 32 RI 453, 80 A 12; Wilson v State, 93 Ga App 229, 91 SE2d 201."

And of the same subject matter, the Supreme Court of Rhode Island points out:

". . . Witnesses are not parties, and should not be partisans. They do not belong to either side of the controversy. They may be summoned by one or the other or both, but are not retained by either. It would be a most unfortunate condition of affairs if a party to a suit, civil or criminal, should be permitted to monopolize the sources of evidence applicable to the case to use or not as might be deemed most advantageous. Such a proceeding in a criminal case would violate the provisions of the Constitution of this state (article 1, § 10), which provides that, 'in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining them in his favor, to have the assistance of counsel in his defense, and shall be at liberty to speak for himself; nor shall he be deprived of life, liberty, or property, unless by the judgment of his peers, or the law of the land.'

"The defendant, therefore, has the constitutional right to have compulsory process for obtaining witnesses to testify in his behalf. He has also the right, either personally or by attorney, to ascertain what their testimony will be." [State v Papa, 32 RI 453, 80 Atl 12 (1911), at page 15.]

Finally, in Leahy v State, 111 Tex Crim 570, 13 SW2d 874 (1928), where accused and his counsel were not permitted to interview a witness prior to the trial, the Court of Criminal Appeals declared, at page 881:

"The question is presented by this bill as to whether the state can legally deny opportunity of interview to the accused or his counsel with a state's witness, or, put in another way, whether the state can, by the affirmative acts of its officers, prevent all contact between a prospective witness for the state and accused or his counsel. . . .

"By the terms of our state Constitution the accused is guaranteed the right of compulsory process for his witnesses. . . . If an accused is to be denied all opportunity to talk to a witness, then the above compulsory process clause of the Constitution becomes in most part an empty and high-sounding phrase. If the state can incarcerate a witness and prevent any chance of interview and opportunity to know in advance what such a one's testimony will be, it is in effect a nullification of the salutary provisions of the clause of the Constitution already referred to, as practically all of its benefits are thus destroyed. Such opportunity of interview would seem to be a necessary implication arising from the compulsory process clause above quoted. The right of reputable counsel to interview a witness has apparently been so rarely denied in American jurisprudence that we find very few cases on the subject."

To the same effect regarding the right of either the accused or his counsel to interview prospective witnesses against him are Shaw v State, 79 Miss 21, 30 So 42 (1901); Exleton v State, 30 Okla Crim 224, 235 P 627 (1925); Pruitt v State, 270 P2d 351 (Okla) (1954); State v Gangner, 73 Mont 187, 235 P 703 (1925); Golson v State, 34 Ala App 396, 40 So 2d 725 (1949); Gallman v State, 29 Ala App 264, 195 So 768 (1940); Wilson v State, 93 Ga

App 229, 91 SE2d 201 (1956); Winston v Commonwealth, 188 Va 386, 49 SE2d 611 (1948); and Bobo v Commonwealth, 187 Va 774, 48 SE2d 213 (1948).

These authorities lead inevitably to the conclusion that the order to the accused was unlawful and unenforceable. A military accused, just as a civilian defendant, has the right to prepare to meet charges pending against him. He, too, is entitled to compulsory process for the production of witnesses and other evidence. Code, supra, Article 46, 10 USC § 846; United States v Sweeney, 14 USCMA 599, 34 CMR 379. But to deny him any access to the witness until the trial of the charges against him, as this order required, makes such entitlement "in most part an empty and high-sounding phrase." Leahy v State, supra, at page 882. The contrary, of course, is true, and we hold that an accused may not, by means of military orders, be required not to contact the witnesses concerned with the charges against him.

In reaching this conclusion, we have not blinded ourselves to the suspicions of accused's commander or his motivation in denying Aycock the right to seek out Airman D and his wife in connection with the latter's complaint. While the record reflects that he did nothing more than to urge them to drop the charges, there was apparently some belief that he might engage in intimidating practices or forbidden means in order to secure his end. Be that as it may, ample remedies are available to prevent such misconduct or, if committed, to punish it severely. See State v Papa, supra; United States v Long, 2 USCMA 60, 6 CMR 60, and 18 USC §§ 1503, 1505. See also Tucker v Commonwealth, 159 Va 1038, 167 SE 253 (1933). Indeed, we are led to wonder why such remedies were not invoked if, as his commander testified, there had been, in the prior case, valid "complaints from the witnesses . . . that he had threatened them unless they dropped the charges." In any event, a wide range of prophylactic measures is available in the armed services to protect the judicial process, and there is clearly no basis in law or need for adding the force of such a broad and unrestricted order to its armory.

The findings of guilty as to the Additional Charge and its specifications are set aside and these counts are ordered dismissed. The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Air Force. The board of review may reassess the sentence on the remaining findings of guilty.

Judge KILDAY concurs.

QUINN, Chief Judge (dissenting):

In my opinion, the principal opinion reads more into the order than was intended by the officer who gave it, and more than was understood by the accused, who received it directly and personally. With the board of review, I am satisfied the order merely prohibited "personal communication" which would harass or threaten the complaining witness and her husband. See board of review decision, April 1, 1964, footnote 3, page 6.

Nothing in the order prohibited accused's counsel from questioning the prospective witnesses in preparation for trial. I agree fully with the following comments by the board of review:

". . . While the accused was prohibited from contacting Airman and Mrs. D, there was nothing to prevent his counsel from doing so. There is nothing in the ordinary case to keep an accused from personally preparing his defense, including the interviewing of witnesses, but such actions usually are performed by his attorney. These particular witnesses were certainly under no cumpulsion to speak to this accused himself and, under the circumstances, it was unlikely that they would willingly do so. Though the right to prepare one's defense is basic (US v Tellier, 13 USCMA 323, 32 CMR 323; US v Nichols, 8 USCMA 119, 23 CMR 343), we see nothing here to indicate that the accused was prevented from doing so and it is significant that no such claim was made at the trial."

[Board of review decision, supra, pages 7–8.]

The order is so "narrowly and tightly drawn," and so specific in its application, that it meets the strict limitations imposed by the *Wysong* case, 9 USCMA 249, 251, 26 CMR 29. I would, therefore, affirm the decision of the board of review.