**UNITED STATES, Appellee,**

v.

**John A. IRWIN, Gunner's Mate (Guns) Third Class, U.S. Navy, Appellant.**

**No. 62,633.**
**NMCM 87 3738.**

U.S. Court of Military Appeals.

April 24, 1990.

For Appellant: *Lieutenant Fredric D. Firestone*, JAGC, USNR (argued).

For Appellee: *Lieutenant J. Richard Chema*, JAGC, USN (argued); *Commander Thomas W. Osborne*, JAGC, USN (on brief); *Commander P. J. McLaughlin*, JAGC, USN, and *Lieutenant John J. Mulrooney, II*, JAGC, USNR.

*Opinion of the Court*

SULLIVAN, Judge:

In July 1987 appellant was tried by a military judge sitting alone as a general court-martial at Naval Legal Service Office, Long Beach, California. Contrary to his pleas, he was found guilty of one specification of committing sodomy on his 10–year–old daughter and two specifications of assault and battery on his minor sons, in violation of Articles 125 and 128, Uniform Code of Military Justice, 10 USC §§ 925 and 928, respectively. Appellant was then sentenced to a dishonorable discharge and confinement for 10 years. The convening authority approved the sentence as adjudged. The Court of Military Review affirmed the findings and sentence in an unpublished opinion dated May 12, 1989.

This Court granted review of the following issue:

WHETHER APPELLANT WAS DENIED HIS RIGHT TO AN EQUAL OPPORTUNITY TO INTERVIEW WITNESSES AND ADEQUATELY PREPARE A DEFENSE, WHERE THE CONVENING AUTHORITY RE-

QUIRED THE PRESENCE OF A THIRD PARTY DURING DEFENSE COUNSEL'S INTERVIEWS WITH THE GOVERNMENT'S CHIEF WITNESSES, AND ONLY LIFTED THIS REQUIREMENT SHORTLY BEFORE TRIAL.

We hold that the convening authority erred in requiring the presence of a third party *only* during the defense pretrial interviews of the child witnesses. Art. 46, UCMJ, 10 USC § 846. Such error, however, was harmless even beyond a reasonable doubt. *See Kentucky v. Stincer,* 482 U.S. 730, 738–39 n. 9, 107 S.Ct. 2658, 2663 n. 9, 96 L.Ed.2d 631 (1987); *cf. Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).

The Court of Military Review recited the following facts in its opinion below:

> The charges in this case were predicated on statements made by the appellant's children which eventually came to the attention of Ms. Parrish, a special agent of the Naval Investigative Service [(NIS)]. From late Autumn 1986, until the time of trial, Ms. Parrish met with the children about 10 times. She testified that it took several months to build up a rapport that permitted a comfortable atmosphere to openly discuss the offenses. After counsel had been assigned, Ms. Parrish suggested to trial counsel that any defense interviews of the witnesses be allowed only in the presence of a neutral third party who could protect the children against a defense lawyer's attempt to "threaten the children or manipulate the facts in any way." This suggestion was conveyed to the convening authority who agreed in principle, and who in turn asked the Commanding Officer, Naval Legal Service Office, Long Beach, to provide a judge advocate to perform this function. Lieutenant Klausmeier was given the job.

> Trial defense counsel had been assigned on 28 April 1987. He was notified on 6 May 1987 that private interviews with the children would not be permitted. Reluctantly, trial defense counsel conducted two interviews of the witnesses with Lieutenant Klausmeier present. After these interviews, Lieutenant Klausmeier told the trial counsel that his presence may be inhibiting the children. This prompted the trial counsel to consult with the convening authority and a decision was made to cancel any requirement that a neutral third party be present at witness interviews. Trial defense counsel was so informed verbally on 19 June 1987 and in writing on 26 June 1987. After the requirement was lifted, the children were regularly available to the defense, but only one additional interview took place. That occurred on 9 July 1987, after the trial had started, and after the defense had complained in court of the previous restrictions on his access to the witnesses, which was followed by a rebuke from the military judge for not pursuing the "open door" policy recently made available. Additionally, the military judge offered the defense a continuance for further trial preparation. No such request was made.

Unpub. op. at 2.

To flesh out the factual summary by the Court of Military Review, reference to the actual testimony of several witnesses is required. (See appendix.) Agent Parrish testified, *inter alia,* as follows:

Questions by the defense.

Q. Agent Parrish, when did you first become aware of this case?

A. In the fall of "86".

Q. Can we pin that down to a month, approximately?

A. I would have to look at my notes to refresh my memory, sometime around October, November.

Q. Okay, that's fine. Okay, and since October, November 1986, you've been working on this—on this case, is that true?

A. Yes.

Q. And during this period from October, November of 1986, how many times have you talked with the Irwin children, or interviewed the—

A. Several times.

Q. Okay, approximately how many times?

A. I'd say approximately—probably approximately ten times.

Q. Okay, is it—is it true that you were involved in the appointment or the need to have Lieutenant Klausmeier or a third party sit in on pretrial defense interviews with the Irwin children?

A. Was I involved in that decision?

Q. Yes, were you?

A. Yes.

Q. And why is that?

A. *It's just standard practice and with people that I work with in the field, both Navy wide and in the civilian sector, it's standard practice that I know and as far as civilian law goes, it is jus—it's just not right to have a defense attorney interview children involved in this type of allegation without—without having a third party present. It's actually against the law in the civilian sector to have a defense attorney interview the children without having the county prosecutor present or somebody from the Children's Protective Services or some type of third party.*

Q. *What about in—in federal practice?*

A. *There hasn't been, we-we've checked into it and there hasn't been a preceden[t] set yet. But just as far as my investigation goes, I, myself, do not like to have the defense attorney meet with the children alone without having a third party present.*

Q. *Even if there's no instances of misconduct by defense counsel?*

A. *Even if there is not any, any acts of misconduct regardless of—of the background of the defense attorney. Whether they've had problems or not, it's just—just the way I like to do my investigations.*

Q. *And why is that?*

A. *Because you can have some defense attorneys obviously that are going to try to find out what actually hap-pened there and to interview children for this type of offense can be very difficult and some defense attorneys will try to take their interviews with the children and—and change things around and confuse the children. The only reason I want a third party in there is to make sure the defense attorney isn't trying to threaten the children or manipulate the facts in any way. I understand they have to have the opportunity to interview the child but I don't want them doing something to confuse the child and if you have a third party in there that's aware of that we can prevent that.*

Q. Trial counsel could also intimidate and threaten, you know, to make certain testimony....

MJ: That's argumentative Lieutenant Dunn, I don't want argumentative questions asked at these hearings. We've got ten motions to get through and we're going to be on the record a long, long time as it is. You make your argument to the bench not to witnesses, understood?

DC: Yes, sir.

Q. Agent Parrish did you or do you have any specific facts or actual instances of misconduct by the defense counsel in this case to warrant the necessity of having Lieutenant Klausmeier or a third party present?

A. No, I don't.

(Emphasis added.)

On this same matter, Captain Heinecke, the convening authority who ordered the challenged restriction, also testified in this case.

Questions by the defense.

Q. Captain Heinecke, you supported the decision to require Lieutenant Klausmeier's presence during pretrial defense interviews, is that—is that true?

A. That's correct.

Q. What was your basis for that?

A. To protect the witness, as it were.

Q. How—what—wha—what wer—what was your fears, what did you feared—

fear about defense counsel interviewing the—the child witnesses?

A. The consideration that I gave it was that I felt it was—it's a young child who could be easily intimidated by the improper type of questioning. In other words, I wanted to make sure, I didn't [know] Lieutenant Klausmeier from anybody, but somebody who was new who felt unbiased of the situation, and I felt that by having the presence of a person there, that the questioning then, therefore, would not be biased in any sort of way. I wasn't going to ask him of any sort of questions or any response or have him report back to me in any way. I checked this out to see if it's legal, and there certainly was nothing illegal about it, so it was my decision to go ahead just to, in my mind, protect the witness.

Q. When did you appoint Lieutenant Klausmeier?

A. I can't recall the date, it was a verbal appointment; it wasn't written.

Q. Okay, how—how did you—okay, how was the appointment made, what did you do?

A. Well it was suggested by my Naval Station Legal Officer, Lieutenant McGrath, that perhaps I might want to consider this, for the very reason I've described as an opportunity to perhaps protect the witness and in discussion it just seemed to me a prudent thing to do, and so from that point I agreed that yes, let's proceed with that.

Q. And when you considered the idea to appoint Lieutenant Klausmeier as an observer, was there any other basis besides, you know, the best interest of the kids or the protection of the kids?

A. No other basis.

Q. No other basis, so you didn't hear anything about—so there wasn't any—any factual situations or specific acts that you feared that—

A. No, solely to protect a youthful witness.

Q. Okay, what was your reasons not—not putting in writing any appointment order of Lieutenant Klausmeier?

A. My—it was my opinion that it wasn't necessary, and I was also advised to by a counsel. Because it really required opinions, personal opinions that really were based on no specific judicial fact.

Q. *Why—why did you not consider having Lieutenant Klausmeier to sit in on trial counsel's interview?*

A. *Could've done it. I would have had no objection to that as well.*

Q. Okay, so why—okay so why did you have Lieutenant Klausmeier sit in on defense interviews?

A. I think the heart of the matter is that for the defense that the questioning probably would have been such that the—the young witness probably would have been dealt with in such a way that your—your—your soliciting a response that probably wouldn't be considered, how can I put this, in o[th]er words, what I' was worried about in the—in the way of defense, the questions would be such that I don't think that the witness would have felt threatened. The concern was, for example, if you, assuming it's you the counsel that's doing this, decided hey, young person if you answer these questions it could possibly get your father in deep trouble. That sort of thing would certainly have a gr— deep impact on a young child. That sort of thinking that made me choose to select Lieutenant Klausmeier to sit in on this. *But having said that, I would have had no objection whatsoever if Lieutenant Klausmeier had sat in on all discussions, either for the defense or otherwise.*

Q. *Okay, would it be fair if—if Lieutenant Klausmeier would have sat in with the—with the trial counsel?*

MJ: I'm sorry, I didn't hear the question, what?

Q. *Would it—would you consider it fair, in your opinion?*

A. *Yes, I would have had no objection to that. I would have considered that fair, to answer your question.*

DC: Okay, thank you.

Q. So, your concern was—was that maybe defense counsel could have said certain things which would have scared the child witnesses?

A. That's correct.

DC: Okay.

A. Not scare, see it's—it's intimidate, scare, I don't know. Just the point is by having somebody there, you're—you're—I felt it was a safe, protective technique to—to ensure that—that—you're here to—to look after the accused, not the little person and somebody has to, in my mind, it would be good to have somebody there to at least have an even hand in se—what the little person was about to say.

Q. *Do you—do you believe that without Lieutenant Klausmeier sitting in on trial counsel's interviews that, you know, the children's statements or testimonies, you know, can, you know, can be—can be prepped or shaped or formed?*

MJ: *I—I'm sorry, that was a complicated question—*

DC: *Okay, I'll repeat it again, sir.*

Q. *Do you believe, s—do you believe Captain that, that the trial counsel having free access, you know, without Lieutenant Klausmeier being present, interviewing the children could also scare the children or make them say certain things or get—or get their testimonies shaped and formed for trial.*

A. *That's my belief—*

MJ: Lieutenant Dunn it's obvious that of course that could happen. Anyone intervi—interviewing children could scare them, that's obvious.

Q. When you—

MJ: I mention that, Lieutenant Dunn, because it's in the area of asking a witness to admit the obvious. And that's an argumentative question of the sort that I really don't want to waste time with.

(Emphasis added.)

Finally, the parties to this trial stipulated to the facts of trial counsel's role in this matter:

It is hereby agreed by and between trial counsel and defense counsel, with the express consent of the accused that the following facts are true.

a. That on or about 6 May 1987, trial counsel relayed to defense counsel that she would not allow the defense to interview the Irwin children without her or NIS agent Parrish being present.

b. That on or about 14 May 1987, by written memo, trial counsel confirmed that a third-party would be present during defense interviews with the Irwin children and that she was in charge of such interviews.

c. That on 21 May 1987, defense counsel had his first interview appointment with Irwin children, however, LT Klausmeier, the observer, failed to appear so the defense counsel could not conduct the interview with the children. LT Klausmeier was notified of the appointment and said he would be present. Defense counsel's first request for an interview with the Irwin children was to interview them on 21 May 1987. The Irwin children were made available on 21 May 1987 as requested.

d. Article 32 Report of Investigation was completed on 29 May 1987.

e. Defense counsel requested from the trial counsel to interview the Irwin children on 17 June 1987 at 0900, or on 19 June 1987 at 1300 and on 23 June 1987 at 0900 or on 25 June 1987 at 1000. Although the defense counsel was available on the above dates, the Irwin children were not made available for interview.

f. On 18 June 1987, trial counsel recommended to Commanding Officer, Naval Station, Long Beach that Lieutenant Klausmeier continue as a third-party

observer during defense interviews with the Irwin children.

g. Defense counsel received referred charges on 1 July 1987.

h. Defense counsel has objected to any third-party being present during defense interviews with the Irwin children from about 6 May 1987 to the present. Defense counsel expressed his objection to the trial counsel on the basis of denial of equal access to the witnesses.

-----

Article 46 states in pertinent part:

Opportunity to obtain witnesses and other evidence

*The trial counsel, the defense counsel,* and the court-martial *shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe.*

(Emphasis added.) This provision of military law cannot be considered novel because it generally reflects practice in federal civilian courts. *See generally United States v. Murdock,* 826 F.2d 771, 773–74 (8th Cir.1987); *United States v. Black,* 767 F.2d 1334, 1337–38 (9th Cir.), *cert. denied,* 474 U.S. 1022, 106 S.Ct. 574, 88 L.Ed. 557 (1985); *Gregory v. United States,* 369 F.2d 185, 187–89 (D.C.Cir.1966), *cert. denied,* 396 U.S. 865, 90 S.Ct. 143, 24 L.Ed.2d 119 (1969). Moreover, unique problems which may arise as a result of command interference with defense pretrial interviews of witnesses have also been considered under this statute. *See United States v. Enloe,* 15 USCMA 256, 258–63, 35 CMR 228, 230–35 (1965); *cf. United States v. Morris,* 24 MJ 93 (CMA 1987). Finally, RCM 701(e), Manual for Courts–Martial, United States, 1984 (Change 2), succinctly summarizes established military practice, as follows:

(e) *Access to witnesses and evidence.* Each party shall have adequate opportunity to prepare its case and equal opportunity to interview witnesses and inspect evidence. *No party may unreasonably impede the access of another party to a witness or evidence.*

### Discussion

*Convening authorities,* commanders and members of their immediate staffs should make no statement, oral or written, and take no action which could reasonably be understood to discourage or prevent witnesses from testifying truthfully before a court-martial, or as a threat of retribution for such testimony.

(Emphasis added.)

On the other hand, this Court has recognized that in certain cases reasonable restrictions on this pretrial right may be imposed, such as the requirement for presence of a third party at the interview. In *United States v. Enloe, supra* at 261–62, 35 CMR at 233–34, this Court said:

Nor are we here concerned with a situation in which the circumstances are such as to demand the presence of a third party at the interview, in order to protect a special interest of either the State or the witness, as, for example, where the witness is a juvenile and the presence of a juvenile officer is required. *Baker v. State,* 47 So.2d 728 (1950), and *Holladay v. State,* 130 Tex.Crim. 585, 95 S.W.2d 118 (1936), or a prosecutrix confined in a state mental institution, *State v. Storrs,* 112 Wash. 675, 192 Pac. 984 (1920). Moreover, we are not confronted with the problem whether any court or officer has the authority to compel any witness, as an individual, to submit to a pretrial interview by either side or to attach such conditions to the granting of that interview as he sees fit. *Cf. Wilkerson v. State,* 57 S.W. 956 (Tex.) (1899); *Withers v. State,* 23 Tex.App. 396, 5 S.W. 121 (1887); *Leahy v. State, supra* [111 Tex.Crim. 570, 13 S.W.2d 874 (1928)]; *State v. Wallack,* 193 Iowa 941, 188 N.W. 131 (1922); *Dicks v. United States,* 253 F.2d 713 (CA 5th Cir.) (1958).

In *United States v. Morris,* 24 MJ at 95, we more particularly stated:

Of course, we are aware that the military judge opined that trial counsel's ad-

vice to the parents went beyond that recommended by standards of the legal profession. However, this advice was given in the context of a repeated refusal by the parents to provide any pretrial access to the alleged victim by the defense. Moreover, it was given after trial counsel had advised the parents to accede to the defense-requested interview. Finally, it was consistent with dicta in *United States v. Enloe, supra* at 261, 35 CMR at 233, which suggests such a condition is appropriate in cases involving juvenile witnesses. Such advice in this context does not violate Article 46[4] or the Sixth Amendment. *See* paras. 42*c* and 44*g*, Manual for Courts–Martial, United States, 1969 (Revised Edition).

[3] The due-process clause of the Fifth Amendment encompasses the right to equal protection of the laws as to the United States. *See Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Equal access to witnesses is required by Article 46, Uniform Code of Military Justice, 10 USC § 846.

[4] *See* n. 3, *supra.*

Again, our recognition of possible reasonable restrictions on this right cannot be considered unique in any way. *See State v. Smith,* 765 P.2d 742, 744 (Mont.1988); *State v. Gress,* 210 Kan. 850, 504 P.2d 256, 261 (1972).

Despite the above, we must conclude that in this case appellant was denied an equal opportunity to obtain witnesses as guaranteed by Article 46. In this regard we disagree with a contrary inference which might be drawn from the military judge's ruling "that the appointment of Lieutenant Klausmeier was not, per se, illegal...." Moreover, we go beyond the opinion of the Court of Military Review and its suggestion that this third-party requirement "may have constituted error." (Unpub. op. at 3.) Finally, we reach this legal conclusion even though the restriction imposed by the convening authority was considered by him to be in the best interests of the child witnesses. *See Cafeteria and*

* The relevance of a Naval Investigative Service Agent's perception of practice in regard to this

*Restaurant Workers Union, Local 473, AFL–CIO v. McElroy,* 367 U.S. 886, 898, 81 S.Ct. 1743, 1750, 6 L.Ed.2d 1230 (1961); *see generally, Coy v. Iowa,* 487 U.S. 1012, ——, 108 S.Ct. 2798, 2803, 101 L.Ed.2d 857 (1988).

The first reason for our holding is the *ex parte* nature of this convening authority's decision to impose the third party-observer requirement. Although the convening authority may have responsibility for these children's safety as a base commander exercising *"parens patriae"* authority (*see Cafeteria Workers v. McElroy, supra*), he cannot simply ignore his role in the court-martial system and his responsibilities under Article 46 and RCM 701. *See generally Cooke v. Orser,* 12 MJ 335, 338 (CMA 1982). Here, he granted trial counsel's request for such an observer which had been initiated by an agent of the Naval Investigative Service and later acceded to by his staff judge advocate. There is no evidence in the record that the defense, either appellant or his counsel, was given any notice or opportunity to respond to this prosecution request before the convening authority acted. *See* RCM 702(c)(1), Discussion, as well as RCM 701(a) and (d). Equal access in this context is chimerical. *See also United States v. Malia,* 6 MJ 65, 68 (CMA 1978).

The second reason for our conclusion is the insufficient basis upon which the convening authority imposed a *unilateral* requirement on the defense for third-party presence at its pretrial interviews of these witnesses. We initially note that this officer acknowledged in his testimony that the children might suffer just as much from trial counsel's questioning as from defense questioning. Otherwise, the blanket restriction on defense interviews was totally unsupported except for the NIS investigator's unjustified indictment * of the defense bar. In *United States v. Enloe, supra,* this Court denounced a similar justification proffered for such a one-sided restriction. There, Judge Ferguson wrote:

legal question is minimal at best.

*The question before us is simply whether the Government may, unilaterally and quite without regard to any particularized considerations, issue a blanket prohibition against all interviews of all agents of the Office of Special Investigations except in the presence of designated third parties. No authority has been called to our attention which sustains such a sweeping claim of power to insulate probable witnesses for the prosecution against pretrial defense examination of their projected testimony. Cf. Byrnes v. United States, 327 F2d 825 (CA 9th Cir.) (1964). To the contrary, ... courts have been reluctant to deny the right to a private, pretrial interview even in specific cases and have chosen to leave the purported dangers of such interviews to be governed by the ordinary strictures imposable in the event of counsel's misconduct. Cf. United States v. Aycock, supra [15 USCMA 158, 35 CMR 130 (1964)]; Gallman v. State, supra [29 Ala.App. 264, 195 So. 768 (1940)].*

We, too, are compelled to conclude that, in light of the provisions of the Manual and the Code regarding equality of access to witnesses and evidence and the lack of need for the consent of opposing counsel to pretrial interviews of witnesses, it is beyond the authority of the United States to interpose itself between the witness and the defense counsel and require, as a condition of granting such interviews, that a third party be present. Manual, *supra*, paragraphs 42, 44; Code, *supra*, Article 46; *United States v. Sweeney* [14 USCMA 599, 34 CMR 379 (1964)], *United States v. Aycock*, ... *supra*. Moreover, we point out that this regulation is so phrased as not to leave in doubt its intention to hamper disclosure to defense counsel of prospective testimony, for it directs the termination of a pretrial interview at any time the agent or the District Commander deems that questions are irrelevant, harassing, or amount to a "fishing expedition." As the usual purpose of out-of-court interviews is to determine the substance of the witness' knowledge concerning the

incidents charged, it is necessarily a "fishing expedition" and frequently will involve matter later found to be irrelevant. And we do not doubt that questions concerning the manner in which a confession was obtained or a search conducted may, though relevant and material, be frequently considered by an agent to be harassing and embarrassing. Yet, by force of its directive, the Government seeks to cut off defense access to the witness on th[is] basis. We venture the guess that it is the success of these "fishing expeditions," rather than the protection of mature, experienced police officers, which led to its promulgation. *See United States v. Kauffman*, 14 USCMA 283, 34 CMR 63 [(1963)]. Whatever the motivation behind it, we repeat our injunction that, while "the Air Force 'is clearly authorized to issue orders ..., it may not perversely use this authority' to hamper an accused in military justice proceedings." *United States v. Aycock, supra*, at page 160.

15 USCMA at 262, 35 CMR at 234 (emphasis added).

Moreover, the late Judge J. Skelly Wright, in *Gregory v. United States, supra* at 188, commented on a general fear of untoward defense conduct in similar circumstances, as follows:

Witnesses, particularly eye witnesses, to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them. Here the defendant was denied that opportunity which, not only the statute, but elemental fairness and due process required that he have. It is true that the prosecutor stated he did not instruct the witnesses not to talk to defense counsel. He did admit that he advised the witnesses not to talk to anyone unless he, the prosecutor, were present.

We accept the prosecutor's statement as to his advice to the witnesses as true. But we know of nothing in the law which gives the prosecutor the right to interfere with the preparation of the defense

by effectively denying defense counsel access to the witnesses except in his presence. Presumably the prosecutor, in interviewing the witnesses, was unencumbered by the presence of defense counsel, and there seems to be no reason why defense counsel should not have an equal opportunity to determine, through interviews with the witnesses, what they know about the case and what they will testify to. In fact, Canon 39 of the Canons of Professional Ethics makes explicit the propriety of such conduct: "A lawyer may properly interview any witness or prospective witness for the opposing side in any civil or criminal action without the consent of opposing counsel or party." Canon 10 of the Code of Trial Conduct of the American College of Trial Lawyers is an almost verbatim provision.

We do not, of course, impugn the motives of the prosecutor in giving his advice to the witnesses. Tampering with witnesses and subornation of perjury are real dangers, especially in a capital case. But there are ways to avert this danger without denying defense counsel access to eye witnesses to the events in suit unless the prosecutor is present to monitor the interview. *We cannot indulge the assumption that this tactic on the part of the prosecution is necessary. Defense counsel are officers of the court. And defense counsel are not exempted from prosecution under the statutes denouncing the crimes of obstruction of justice and subornation of perjury.* In fact, the Government's motivation in disallowing defense counsel to interview witnesses apparently stems from factors other than fear of tampering. Recent records in this court reveal that the same policy followed in this case is followed even when the witness involved is a member of the police force. *See Holmes v. United States*, 125 U.S. App.D.C. 187, 370 F.2d 209 (1966), Tr. pp. 138–139.

A criminal trial, like its civil counterpart, is a quest for truth. That quest will more often be successful if both sides have an equal opportunity to interview the persons who have the information from which the truth may be determined.

(Emphasis added.) This same legal reasoning justifies our rejection of the convening authority's unilateral decision in the present case.

 A remaining question we must address is whether this error under Article 46 was prejudicial. *United States v. Killebrew*, 9 MJ 154, 162 (CMA 1980); *United States v. Cumberledge*, 6 MJ 203, 206 (CMA 1979); *United States v. Enloe, supra* at 262, 35 CMR at 234. We note that the convening authority withdrew his third-party observer requirement over a week before the court-martial and 30 days before any of the child witnesses actually testified in this case. We also note that defense counsel only once interviewed these witnesses after the complained-of restriction was lifted. *See State v. Gress*, 504 P.2d at 261. Moreover, the military judge issued a protective order in this case to the third-party observer preventing him from disclosing any statements made during these interviews except as required by the defense or a competent court. This was a significant concern expressed by appellant at trial. Finally, in response to the defense's additional concern for trial preparation, the military judge offered the defense a continuance of the court-martial for this purpose in light of his ruling. *United States v. Rodgers*, 624 F.2d 1303, 1311 (5th Cir.1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981).

Nevertheless, appellant's implied assertion of prejudice at trial and express assertion on appeal was that the interview environment orchestrated by the Government prevented him from establishing the same "rapport" with these witnesses as did the prosecution. *See generally United States v. Morris*, 24 MJ at 95. We find such a contention to be highly speculative in the present case. There was simply no testimony from the child witnesses or defense counsel that an unfriendly or uncooperative relationship existed between them. Admittedly there was testimony from Agent

Parrish that it took several months for her "to develop ... rapport with the children." Moreover, Lieutenant Klausmeier, the third-party observer, testified that he personally felt his male presence may have been a hindrance at the defense interviews. However, this evidence by itself does not convince us that appellant suffered actual prejudice. *Cf. United States v. Killebrew, supra.* We find this particularly so where defense counsel had ample opportunity to develop this rapport at a later date and failed to provide evidence that he was further obstructed in this regard or was incapable of doing so because of past restrictions. *See generally United States v. Davis,* 29 MJ 357 (CMA 1990); *see Hopkinson v. Shillinger,* 866 F.2d 1185, 1212 (10th Cir.1989).

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Chief Judge EVERETT and Judge COX concur.

## APPENDIX

MJ: The defense motion to dismiss or exclude is denied. Essential findings follow. I make the finding—the following findings of fact:

First, discussions between trial counsel and NIS Agent Parrish le[d] trial counsel to conclude in early May 1987 that government insistance upon the presence of a neutral third party observe[r] at defense counsel's interviews with the Irwin children, alleged victims in this case, was legally permissible and socially desirable to protect unspecified interests of the Irwin children.

Second, trial counsel discussed the appointment of an observer with Lieutenant McGrath, the Staff Judge Advocate of the Convening Authority, of the Article 32 Investigation in this case, Captain Heinecke.

Third, Lieutenant McGrath recommended the appointment of an observer to Captain Heinecke, who sought the services of a Navy Judge Advocate from Captain Wells, the Commanding Officer of Naval Legal Service Office, Long Beach.

Fourth, Lieutenant Howard Klausmeier, JAG, USNR, was made available and was orally appointed by Captain Heinecke.

Fifth, Captain Heinecke is able to articulate only one intention in regard to the function that he wanted Lieutenant Klausmeier to perform. That is, to deter, by his presence alone to. deter, the defense counsel, Lieutenant Dunn, from attempting to suborn perjury or obstruct justice in the course of his interviews with the Irwin children. However, Captain Heinecke did not communicate this intention to Lieutenant Klausmeier.

Sixth, in the absence of direction from the Convening Authority who appointed him, Lieutenant Klausmeier found his own charter for his function as observer. He resolved to attend the interviews, to say nothing aside from pleasantries, to avoid any disturbance or interference with the interviews, even to the detail of sitting in a low chair, and to repeat nothing that he had heard in the interviews, excepting only an attempt on defense counsel's part to suborn perjury or obstruct justice. *Lieutenant Klausmeier implemented that resolve and had nothing to report. Indeed, there never was any factual basis upon which anyone involved in this case had reason to suppose that defense counsel would attempt to suborn perjury or to obstruct justice.*

Seventh, Lieutenant Klausmeier has not told anyone anything that the Irwin children said to defense counsel, or that defense counsel said to the Irwin children. And he is under court order not to do so, except as provided in Appellate Exhibit XXVIII.

Eighth, several logistical complications were inherent in arranging defense counsel interviews with the Ir-

win children. These included attendance of the children at school, Defense counsel's own schedule, and the good faith belief on Lieutenant McGrath's part that the Irwin children were the subject of a civil court protective order limiting the accused's access to his children and, perhaps, denying knowledge of the children's whereabouts to the accused. The perceived need to have Lieutenant Klausmeier present at the interviews was an additional logistical complication, but was of no great moment, in view of the complications already extant in the case. Lieutenant Klausmeier missed the first appointment for interview and, as a result, that interview did not take place. Lieutenant Klausmeier attended two, perhaps three, interviews but did not interfere in any way with defense counsel's interviews with the Irwin children.

Ninth, Lieutenant Klausmeier perceived that the Irwin children were slow to confide in Lieutenant Dunn and became concerned that his mere physical presence might be discouraging defense counsel's development of rapport with the children. In this regard, I find that Lieutenant Klausmeier's demeanor is warm and friendly in the extreme and not threatening in any way. Nevertheless, Lieutenant Klausmeier became concerned about his presence as aforesaid and he indicated that concern to the trial counsel sometime in the mid-June time frame. On 18 June, trial counsel continued to adhere to the position that Lieutenant Klausmeier's presence as observe[r] was necessary and proper. On 22 June, however, trial counsel advised defense counsel in writing that she would recommend to Captain Heinecke that Lieutenant Klausmeier be relieved. On 26 June Captain Heinecke formally notified defense counsel that Lieutenant Klausmeier's presence at defense counsel's interviews would no longer be required. On 22 June, when trial counsel informed defense counsel

that she would recommend Lieutenant Klausmeier's relief as observer, she also gave defense counsel Mrs. Irwin's telephone number, advising defense counsel that he could make his own appointments....

In the context of these events, defense counsel knew, or should have know[n], on 22 June that he was free to make his own appointments with the Irwin children without the presence of any observer and without government imposed restraints of any kind. And if defense counsel did not know this, the fault was his own for failing to inquire or resolve any ambiguity at that time.

Tenth, neither the appointment of Lieutenant Klausmeier as observer nor his presence at some of defense counsel's interviews with the Irwin children, hindered the defense's preparation for trial in this case. Defense counsel's escalating efforts to smoke out a copy of a non-existent appointing order and his protestations before this court of wrongful interference with defense preparation for trial are so much sound and fury, signifying nothing. The accused has simply not been prejudiced in this matter.

Eleventh, no one-Not trial counsel, Nor Special Agent Parrish, Nor Lieutenant McGrath, Nor Captain Heinecke-Even analyzed the "best interests of the Irwin children" in any careful detail. I find, however, a legitimate concern, however unarticulated, on the part of all the aforementioned individuals, to protect the Irwin children, ages 5, 7 and 10, from unnecessary trauma attending the preparation of this case from trial. This concern was properly founded in parens patria duty in Captain Heinecke to look after the health and welfare of Navy dependents.

I make the following conclusions of law:

This motion raises the issue left unanswered in United States versus Morris, a case decided by the Court of Military Appeals on 18 June 1987,

whether it is ever permissible for the government to insist upon the attendance of a third party observer at defense counsel interviews with children of tender years. On this issue, all of us, military judge included, are perched on the leading edge of developments in law relating to alleged crimes of violence against children. The answer of this trial judge is, Yes a third party observer is sometimes permissible, if only to provide a friendly face as refuge against the trauma which is inherent in a stranger's questioning little children about matters which are potentially hurtful by their very nature. *Now, while the record in this case is hardly a model of how best to proceed with a third party procedure, I have concluded that the appointment of Lieutenant Klausmeier was not, per se, illegal, did not constitute prosecutorial misconduct, and did not prejudice this accused.* I have imposed a protective order ... to ensure that the accused will not be prejudiced during the trial of this case.

I note, in passing, that defense counsel enjoyed an advantage in having Lieutenant Klausmeier present at some interviews because he has a witness to the absence of any attempt on his part to attempt subornation of perjury, or to obstruct justice. And, that during the trial of this case, defense counsel will enjoy the unique advantage of being able to call Lieutenant Klausmeier as a witness to put on extrinsic evidence of any prior inconsistent statement of the Irwin children, in the event the need of such evidence arises at trial. But that protective order is all the relief to which the accused is entitled. I will not dismiss charges and will not exclude the testimony of the Irwin children. If defense counsel requires a continuance to further prepare for trial and if he has a good reason for needing a continuance, I will grant a reasonable continuance. But the delay occasioned by such a continuance will be defense delay, not government delay.

(Emphasis added.)