CRAWFORD, Judge
(dissenting):
I cannot embrace the view of the law, the facts, or the role of this Court that inheres in the majority’s conclusions. Consequently, I must respectfully, but emphatically dissent.
LAW
When enacted in 1950, Article 46, Uniform Code of Military Justice (UCMJ),[1] provided, as it does today:
The trial counsel, [the] defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe. Process issued in court-martial cases to compel witnesses to appear and testify and to compel the production of other evidence shall be similar to that which courts of the United States having criminal jurisdiction may lawfully issue and shall run to any part of the United States, its Territories, [Commonwealths,] and possessions.
Quoting only the first clause of this statute,[2] the majority concludes that Congress expressly intended each accused at court-martial to enjoy a statutory entitlement[3] to an expert consultant with professional qualifications “reasonably comparable to those of the Government expert.”
I find no such intent in either the language or history of Article 46. I do not regard as surplusage the clause “in accordance with such regulations as the President may prescribe.” And I believe we have no power to usurp the President’s authority to promulgate regulations in implementation of statute. I much prefer to consider and apply the rights, benefits, and restrictions made applicable to government funding of defense experts by the Sixth Amendment, Article 46, Supreme Court precedent, the Federal Rifles of Criminal Procedure, and our own decisions over the past half century in determining whether the military judge abused his discretion in this ease. I conclude that he did not, and I would affirm.
In one of our earliest examinations of Article 46, this Court began by discussing the Sixth Amendment, then quoting the first clause of Article 46 itself, followed by a partial recitation of Manual for Courts-Martial, United States (MCM)( 1951 ed.) H 115a, and noting that “this Article of the Code, and the regulations prescribed by the President in furtherance thereof, generally conform with *124 the rules and procedure followed in civilian Federal courts.”[4]
After quoting the entirety of Fed. R.Crim.P. 17(b),[5] we concluded by saying: “It is readily apparent that the only substantial difference between Rule 17(b) and paragraph 115a is the necessity for the civilian defendant to aver that he [or she] does not have the means to pay the necessary costs attendant upon the witnesses’ appearance.” 14 C.M.A. at 602, 34 C.M.R. at 382. In another early interpretation, we relied entirely on state and federal decisions and the Federal Rules of Criminal Procedure in determining the scope and meaning of Article 46: “A military accused, just as a civilian defendant, has the right to prepare to meet charges pending against him. He, too, is entitled to compulsory process for the production of witnesses and other evidence.”[6] I am mystified by how we came from that position to today’s rejection — not only of Supreme Court precedent, federal and state decisional law, federal rules, the Sixth Amendment, and the President’s implementation of Article 46 — but our own long-standing precedent[7] as well. Although the Rules for Courts-Martial (R.C.M.) are created by the President, rather than Congress, we should heed the reasoning of our superior court before we assume the power to amend or create those rules:
Congress has the power to prescribe rules of procedure for the federal courts, and has from the earliest days exercised that power.... The power of this Court to prescribe rules of procedure and evidence for the federal courts exists only in the absence of a relevant Act of Congress.[8]
FACTS
So flawed is this case, in both facts and posture, as a vehicle for the majority’s usurpative pronouncement, that I am compelled to start from the beginning, accepting only the lead opinion’s recitation of the facts of the crime and the procedural events. Fortunately, I have the correct findings of fact by the military judge and the well reasoned decision of the court below to serve as guideposts.
Relevant facts are drawn from the record of trial, and we accept the factual findings of the courts of criminal appeals unless they are clearly erroneous. United States v. Burris, 21 M.J. 140, 144 n. 7 (C.M.A.1985), cf. United States v. Barron, 52 M.J. 1, 6 (C.A.A.F.1999). The averments of counsel during motions practice and oral argument may be informative, but they are not evidence. United States v. Loving, 41 M.J. 213, 238 (C.A.A.F. 1994). Confining the facts to those in the record of trial, or as found by the court below, we must accept that:
A. Neither Dr. Susan Brown nor Dr. Wilbur Smith testified on the motion at trial.
B. Dr. Brown’s sworn affidavit, admitted on the motion at trial, Appellate Exhibit (A.E.) X, details her education and experience in dealing with child abuse, including her board certification in pediatries and adolescent medicine. Her primary expertise is in adolescent medicine, but she has significant training and experience in child abuse other than sexual abuse and other than with adolescents. Unlike Dr. Smith, Dr. Brown *125 has testified in twenty to twenty-five courts-martial, is a career officer, and has experience with both the military medical structure and the medicolegal aspects of practice. Specifically addressing her qualifications with respect to shaken baby syndrome, Dr. Brown averred:
I have been an expert consultant and/or witness in about 20-25 courts-martial. I have testified about child pornography, child sex abuse and various other aspects of child abuse such as perforated bowel, fractures, failure to thrive, burns, skin manifestations of abuse, children’s memory and suggestibility and Munchausen’s syndrome by proxy. My specialties are adolescent medicine and pediatrics. In the area of child abuse, I have the most direct clinical experience with child sexual abuse. I have not, however, been a consultant or witness at trial for Shaken Baby Syndrome. Even though, I feel competent in this area of child abuse, specifically Shaken Baby Syndrome, I am not the equivalent of Dr. Stephen Boos. There are other physicians who are better qualified than me when it comes to “Shaken Baby” cases.
A.E. X at 29 (emphasis added).
Dr. Brown was appointed by the convening authority as an expert consultant to the defense team on April 3, 2001, six weeks prior to trial.[9] Id. at 19.
C. The defense provided no affidavit, testimonial substitute, or synopsis (either as to expected testimony or as to how Dr. Smith could assist the defense) in support of their request to the convening authority that Dr. Smith be appointed “an expert consultant to assist the Defense in the preparation and defense in this case, and possibly to testify as a witness.... ” Id. at 9 (emphasis added). In fact, both the request to the convening authority and trial defense counsel’s motion to compel appointment of Dr. Smith are devoid of any averment that defense counsel had even spoken with Dr. Smith regarding the latter’s qualifications or what he could do for the defense. United States v. Warner, 59 M.J. 573, 578 (A.F.Ct.Crim.App.2003).
D. In a written pretrial motion, the defense sought appointment of Dr. Smith as a replacement for Dr. Brown. Therein, counsel made averments of “fact” (which included opinion and conjecture) as to the qualifications of both Dr. Smith and Dr. Brown; however, the defense “evidence” in support of these averments consisted only of an unattested curriculum vitae (CV) attributed to Dr. Smith and a sworn affidavit from Dr. Brown. The defense provided no affidavit or other testimonial substitute regarding Dr. Smith’s qualifications, how Dr. Smith could help the defense, or any indication that the defense had discussed matters of substance with Dr. Smith. The defense eschewed their entitlement to a session pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a)(2000), on this motion,[10] at which counsel could have presented the required evidence, or even examined Dr. Brown under oath to support his attack on her credentials. In that same motion, the defense contended that Dr. Brown would not be available to assist the defense in the two weeks immediately prior to trial. The Government filed no response, and the military judge made the following findings:
1. The time period for the Government to reply as provided for in the Air Force Rules having expired, and no request for extension of time having been filed, the court deems the Government to have waived its right to reply.
2. For purposes of this motion, the defense statement of facts is accepted.
3. Since the convening authority has already determined that a defense consultant is necessary and appropriate and will *126 be provided, the court does not need to act in that regard.
4. Defense counsel have requested the court to direct that Dr. William Smith be retained to act as a defense expert consultant and potential witness in lieu of the convening authority approved expert, Doctor (LtCol) Susan Brown. They base this request on two primary grounds. First, they assert Dr. Brown is neither sufficiently qualified in the relevant field, that is, shaken baby syndrome, nor are her qualifications of a stature reasonably close to those of the government’s expert. Second, they complain Doctor Brown will not be available to assist them during the crucial two-week period before trial. Doctor Brown will apparently be on a humanitarian mission, out of the country, out of telephone contact in that two-week period, returning in the eve of the trial.
Based on the foregoing, the court issues the following orders:
5. The defense request for the appointment of Doctor Smith is DENIED.
6. The defense request for the appointment of a new expert consultant is GRANTED. This decision is based solely on the matter of Doctor Brown’s availability. The court can think of no more critical period when counsel need the services of this expert than the two weeks before trial. Since Doctor Brown is an active duty service member, her schedule is totally within the control of the Air Force. Sending her out of country for the two weeks before trial denies the accused a fundamental right to which the convening authority has already determined he is entitled.
7. The court has neither considered nor ruled upon defense counsel’s expressed concerns about Doctor Brown being substantially less qualified than the Government expert in their comparative stature. It is unnecessary to do so in light of the ruling in the previous paragraph. But the court is mindful of the multitude of eases on the subject, many of them referred to in the defense brief, and strongly suggests any new expert consultant appointed have the expertise and experience to meet the threshold criteria of the appellate court decisions.
A.E. VIII at 1-2 (emphasis added).
E. Still prior to trial, the military judge was apprised by both counsel that Dr. Brown’s scheduled pretrial absence had been cancelled. The trial counsel asked the military judge to reconsider his earlier ruling, the defense did not object, and the military judge then made substantive findings of fact regarding the qualifications of Dr. Brown and Dr. Boos, incorporating their CVs in his findings of fact. As to Dr. Smith, the military judge noted only that the defense had requested him, making no findings as to his qualifications. In that order (attached to this opinion as an appendix), the military judge expressly rescinded his prior order. In denying Appellant’s request for Dr. Smith and approving appointment of Dr. Brown as a defense expert consultant, the military judge ruled:
An individual provided to the defense to act in the capacity of an expert consultant need not be the premier expert in the field. Rather, the consultant must be professionally qualified in a relevant field of expertise, and be capable of analyzing court issues germane to that field and providing expert opinions and advice to the defense team. Based on the information provided, the court finds Doctor Brown is competent to act as a consultant in the area of child abuse, and specifically shaken baby syndrome.
A.E. V at 2 (emphasis added).
F. At trial, when offered the opportunity to present evidence and have the motion reconsidered by the military judge, Appellant’s counsel affirmatively declined. At no time did defense counsel make an offer of proof regarding any interview of, or statements by Dr. Smith. Further, there is no evidence that the defense used Dr. Brown— despite her appointment to the defense team six weeks prior to trial' — to assist them in making a more credible request for the services of Dr. Smith, to obtain a different expert consultant, to review defense theories and offer advice, or to identify any potential expert witnesses.
*127 G. As the majority notes, in a ruling and order dealing solely with Dr. Brown’s anticipated unavailability, the military judge included the statement: “‘[f]or purposes of this motion, the defense statement of facts is accepted.’ ” Warner, 62 M.J. at 117. That lengthy statement of “facts” included defense counsel’s opinions, averments, and conjecture.[11] Notwithstanding the military judge’s express, affirmative exclusion of the issue of professional qualifications from that ruling, and the military judge’s later express rescission of that ruling, the majority reasons that to avoid a “cumulative and problematic” effect, the opinions and conclusions of defense counsel and Dr. Smith’s unattested CV, must now become unassailable “facts of record,” Warner, 62 M.J. at 117, 118 n. 11, which bind this Court.[12] To the contrary, it could not be more glaringly apparent that, in his first order, the military judge accepted certain facts for the purpose of expeditiously dealing only with the question of Dr. Brown’s availability, while expressly excluding consideration of qualification issues. Only in his second ruling, which rescinded the first, did the military judge address questions of professional qualifications.
H. Although the defense avoided every opportunity either to put on evidence or make an offer of proof, in their motion, AE. X, counsel averred, among other things, that Dr. Smith had “taught, lectured on pediatric radiology and child abuse,” “has written numerous publications on head trauma and brain injury,” “has extensive experience in diagnosing head trauma in infants,” and “has the training and experience in evaluating cases like BT’s.”[13]
I. If this Court had factfinding authority, we could conclude from Dr. Smith’s very lengthy CV that he: is an expert in radiological detection of a vast array of injuries and disorders, has significant experience and academic credentials in the area of traumatic child injury and abuse, and is an experienced lecturer and author in both areas. However eminent and well qualified Dr. Smith may actually be, neither the CV nor any other evidence offered by the defense (or even an offer of proof) supports a conclusion that Dr. Smith is an eminent or leading expert in shaken baby syndrome, that he has ever treated any children for shaken baby syndrome, or that he has any expertise in forensic pediatries or other specialties that might establish his ability to assess causes of injuries or “suggest alternative theories” for the defense.
J. As reflected in the record of trial, and as found by both the military judge and the court below, at no time prior to, or during, the proceedings did Appellant request Dr. Smith as an expert witness, nor did he request any other expert witness.
DISCUSSION
The majority opinion improperly augments the record of trial with Appellant’s arguments and averments and rewrites not only our precedent, but R.C.M. 703 and Article 46, as well. Rejecting the findings of fact by the military judge and the court below without determining that such findings were clearly erroneous, the opinion finds new sources of evidence to support the conclusion that Dr. *128 Brown was not an “adequate substitute” for Dr. Smith. Enigmatically, this result is obtained not because Dr. Brown’s credentials were not equivalent to those attributed to Dr. Smith, but because Dr. Brown did not possess “professional qualifications ... reasonably comparable to those of the Government’s expert.” Warner, 62 M.J. at 122-23.
The majority opinion does not conclude that the military judge and the court below failed to properly consider Article 46, R.C.M. 703, or the relevant precedent of this Court and the Supreme Court. Rather, based on their own factfinding, the majority opinion concludes that both the military judge and the court below abused their discretion “because they were influenced by an erroneous view of the law.” 62 M.J. at 120. The opinion offers no standard by which the military judge’s abuse was measured, nor an explanation as to how the military judge could have held an “erroneous view of the law” when the law in question had yet to be invented, whole cloth, by this Court some four years after his ruling. Just as in United States v. Wiesen:
My analysis shows that the trial judge did not abuse his discretion in this case. The judge exercised his discretion with no knowledge that this Court would expand the law as the majority does today. When the judge made his ruling that is overturned today by the majority, there was no case law suggesting this holding. Interestingly enough, the majority cites no ease law as support for this new extension of the law.
56 M.J. 172, 183 (C.A.A.F.2001)(Sullivan, J., dissenting).
Finally, usurping the power given only to Congress and the President to legislate or promulgate evidentiary and procedural rules, the opinion rewrites Article 46 and R.C.M. 703(d) to incorporate their new rule. The result is a retrospective rule that will alter the landscape of every court-martial now on appeal or yet to be tried, that involves either a Government expert consultant or expert witness. To borrow a phrase, “we are left here with a jerry-built house of cards on a foundation of shifting sands.” Backus Plywood Corp. v. Commercial Decal, Inc., 208 F.Supp. 687, 696 (S.D.N.Y.1962).
There are three critical propositions raised by the majority opinion with which I take particular issue.
A. “ADEQUATE SUBSTITUTE”
The quoted language of R.C.M. 703(d) has never been applied, nor was it ever intended to apply, to a Government expert, rather than to an expert requested by the defense and denied by the Government. The majority opinion’s claim that such a construction is a means to satisfy congressional intent underlying Article 46 is, unsurprisingly, completely unsupported by any citation to supporting authority; its ipse dixit character is self-evident.
“Adequate substitute” is not defined in the R. C.M. Nonetheless, this Court has employed “competent assistance” to measure the concept. See Ndanyi, 45 M.J. at 319 holding that “As long as the Government was willing to provide competent assistance at government expense — which the defense preemptively rejected — the Government’s burden was satisfied. (The defense could either accept such assistance or look to its own resources.”). As we have stated:
An accused is not ... entitled to a specific expert of his own choosing. All that is required is that competent assistance be made available. As this Court observed in United States v. Garries, 22 M.J. 288, 290-91 (1986), “In the usual case, the investigative, medical, and other expert services available in the military are sufficient to permit the defense to adequately prepare for trial.”
United States v. Short, 50 M.J. 370, 372-73 (C.A.A.F.1999) (citation and quotation marks omitted), cert. denied, 528 U.S. 1105, 120 S. Ct. 843, 145 L.Ed.2d 712 (2000).[14]
*129 Neither these eases, nor the text, comments, or analysis of R.C.M. 703 contain even a suggestion that “adequate substitute” is to be measured against any standard other than the expert requested by the defense. See, e.g., Ndanyi Ford, Garries, and Gonzalez[15]
However, the majority distinguishes this line of cases as arising merely from the United States Constitution and the Supreme Court, and then finds in Article 46 a manifestation of congressional intent that has lain dormant for over fifty years.
The first sentence of Article 46 provides that “[t]he trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe.” Emphasis added. While insisting that the plain text of Article 46 compels their conclusions, the majority gives such dispositive weight to the first clause of Article 46 that the second clause is rendered virtually meaningless. As a result, this Court is now prescribing regulations, relegating the President to the ministerial function of summarizing the Court’s implementation of Article 46 in the next edition of the MCM. This, Congress did not intend.
Having insisted on this path in a case dealing not with expert witnesses but with consultants, the other shoe is likely to drop soon.[16] When it does, and this Court is asked to apply that same congressional intent to substitute defense investigators and substitute laboratory assets, where will the Court look in Article 46 to find that Congress did not intend that such assets also be “reasonably comparable to those of the government”?
Congress included the second clause of Article 46 for good reason. It is within the President’s discretion to regulate how and by what measure “equal opportunity” is to be applied. Unless we are prepared to hold the President’s implementation of Article 46 to be in violation of either the article itself or some higher authority, we are not at liberty to strike it down or amend it.
After today, once the defense demonstrates the need for an expert consultant and/or requests a particular consultant, this Court’s new rule will require that the Government either: (1) pay for the consultant the accused has requested (with the obvious danger that the accused may exercise his right to a more highly qualified expert should the Government procure an expert with qualifications superior to those of the accused’s first expert), or (2) without regard to the credentials of the requested expert, procure for the defense a substitute with “professional qualifications ... reasonably comparable to those of the Government’s expert.” Warner, 62 M.J. at 122-23 (emphasis added).
This process is certainly not compelled by Article 46 and thus usurps the President’s authority to implement that statute as he chooses, as long as that implementation does *130 not violate Article 46 or some higher authority. See R.C.M. 703.
Claiming to rely on “the plain wording of Article 46” in divining this newfound “congressional intent” to provide near absolute equality of trial team resources, the majority utterly rejects the context in which Article 46 was enacted and eviscerates the President’s rulemaking authority. Because we are neither Congress nor the President, I must respectfully decline to join the majority’s speculation.
B. DR. BROWN VS. DR. SMITH
Setting aside for the moment the majority’s reinventing of Article 46 and R.C.M. 703, the question becomes whether Dr. Brown was an “adequate substitute” for Dr. Smith as an expert consultant. There is no evidence to support the majority’s contention that Dr. Brown was either unqualified or measurably less qualified than Dr. Smith to serve the defense as an expert consultant.
Counsel are advocates. Their role is to argue the facts, sometimes quite creatively. “After all, advocates ... are like managers of pugilistic and election contestants in that they have a propensity for claiming everything.”[17] What is not evidence, is not an offer of proof,[18] and is not before this Court as anything other than unsupported argument is that which counsel have “averred” in written pretrial motions: “that based on the defense counsel’s conversations with Dr. Brown, the defense counsel believed she would merely ‘defer’ to the opinions of Dr. Boos”; and “that while Dr. Brown ‘is able to advise the defense generally on the timing of the injuries,’ she could not advise the [defense concerning ‘possible alternative explanations.’ ” Warner, 62 M.J. at 117. Also not evidence — particularly in the face of a contrary holding by the court below — are counsel’s arguments that Dr. Smith could provide something to the defense that Dr. Brown could not. Warner, 59 M.J. at 579-80.
After exhalting defense counsel’s recitation of facts, in which Dr. Brown’s affidavit was incorporated, the majority enigmatically refers to Dr. Brown as a “generalist with no apparent expertise in [shaken baby syndrome],” Warner, 62 M.J. at 118-19, and concludes that “neither the Air Force Court nor the dissent has identified anything in the record demonstrating that Dr. Brown had any experience in the area of shaken baby syndrome.” Id. (emphasis added). To the contrary, in an affidavit appended to the very defense motion that the majority hails as the facts of record, A.E. X at 29, Dr. Brown swore that “I feel competent in this area of child abuse, specifically, Shaken Baby Syndrome----” In A.E. V at 1, the military judge found that Dr. Brown had “14 years of experience in pediatrics, including her periods of internship and residency. Further, she has continued post graduate training in child abuse and forensic pediatrics.... ” I am unwilling to assume that Dr. Brown was born with the competence she claimed, or to assume that, as a Lieutenant Colonel in the Air Force, she was willing to lie under oath about her competence, or to assume that in the course of fourteen years of pediatric practice in military hospitals and post graduate training in forensic pediatrics, she had no experience in shaken baby cases upon which to base her sworn assessment of competence.[19]
In declining to put his appointed consultant on the stand to expose her allegedly deficient experience and her unsuitability as a consultant,[20] Appellant failed to meet his *131 burden. Rather than recognize that, the majority rewards this practice by applying unwarranted presumptions to the detriment of Dr. Brown’s sworn, candid statement of competence, while applying nearly opposite presumptions in favor of Dr. Smith’s unsworn CV, and then elevating defense counsel’s unsupported averments to evidentiary status by reviving a rescinded ruling of the military judge. In so doing, the majority rejects the credibility determinations of the trial judge and substitutes their own factual findings for those of both the trial judge and the court below.
The record firmly supports the determinations of the military judge and the court below that Dr. Brown was qualified, not as an eminent expert in the field of shaken baby syndrome, but to serve as a defense consultant on shaken baby syndrome.[21]
Appellant’s trial defense counsel elected to support his motion with nothing other than Dr. Smith’s CV — no statements, no affidavits, no letters, not even an offer of proof. See A.E. X; R. at 16. Regardless of what Dr. Smith’s qualifications may actually be, nothing in Dr. Smith’s CV establishes either that he was an eminent expert in shaken baby syndrome or that he was as qualified in that area as Dr. Boos, the standard against which the majority measures the qualifications of Dr. Brown. Yet it is that “eminence” on which the majority relies in concluding that only Dr. Smith and, not Dr. Brown, “would have assisted the defense in evaluating, identifying and developing evidence.” Warner, 62 M.J. at 118.
At trial, defense counsel affirmatively declined to offer any other evidence on the motion, even declining to call his own consultant to the stand, either to expose her weaknesses or to establish .a description of a more qualified consultant.
Where the majority has failed, the military judge and the court below succeeded. They properly considered the evidence of record and, consistent with all known law, assigned to the averments of counsel the evidentiary weight they deserved. It is in this factual context, and not in that proposed by the majority,[22] that we must determine whether the military judge abused his discretion in ruling that the expert the Government provided to the defense was “an adequate substitute for the defense-requested civilian expert.” Warner, 62 M.J. at 120. Applying the legal standards recited above, and after reviewing the facts from the record of trial, it is clear that neither the military judge nor the court below abused their discretion in ruling on this issue.
C. ABSENCE OF ERROR OR PREJUDICE
No eiTor occurred at trial involving (1) the testimony of Dr. Boos, (2) the effectiveness of the defense attack on that testimony, or (3) the defense’s opportunity to receive expert advice or present their own expert testimony.
Appellant made no request before or during trial for an expert witness, nor did he ever proffer or contend that any expert would offer opinion or testimony contrary to that of Dr. Boos. Since the defense made no request for any expert witness, the majority’s concern for the effect of Dr. Boos’ “vastly superior qualifications” at trial is a non sequitor. Warner, 62 M.J. at 119.
*132 The majority’s gymnastic pronouncements seem to require first, an assumption that Congress intended the accused at courts-martial to have expert consultants with qualifications “reasonably comparable” to those of the Government’s expert consultant or witness; and, second, that if the Government fails to meet this requirement at the consultant stage, Congress intended that this Court substitute conjecture and assumption for the record of trial in evaluating both error and prejudice. I prefer a more traditional analysis.
As noted above, the defense avoided every opportunity to establish, by proffer or evidence, Dr. Smith’s qualifications or potential contributions. The defense requested no expert witness. The defense counsel did not object to having Dr. Boos recognized as an expert. Despite having had Dr. Brown available to the defense team for six weeks prior to trial, the defense also avoided every opportunity to expose her lack of qualifications by simply calling her to testify at a motions hearing.
During a session pursuant to Article 39(a), trial counsel stated that Dr. Boos would testify that, in “his professional opinion, as a result of his review of BT’s file,” when asked to opine on the cause of injury, “instead of responding child abuse, he responds that it was one of two things: either a vigorous shaking or a swinging that was stopped by him hitting a soft object.” When the military judge queried the defense for objection, defense counsel responded “No, not at all, sir.” In fact, the defense made no objection to any of Dr. Boos’s testimony. On cross-examination, defense counsel elicited alternative theories of injury, including birth defects, prenatal trauma, and trauma during birth, that could explain Dr. Boos’s interpretations of the electronic images. Defense counsel also elicited testimony potentially inconsistent with a diagnosis of shaken baby syndrome. The cross-examination established defense counsel’s knowledge of the subject, including conditions, diagnostic techniques, and alternative theories for the cause of BT’s injuries.
In their opening statement, the defense team conceded that they may not call any witnesses, but cautioned the members not to give too much weight to Dr. Boos’s testimony, citing specific areas of practice in which Dr. Boos was unskilled, themes they repeated on closing. The trial counsel’s passing mention of Dr. Boos’s qualifications in his opening[23] was more than offset by the defense’s apparently effective attack on Dr. Boos during cross-examination. Other than arguing the relative importance of Dr. Boos’s lack of experience in radiology, neither counsel emphasized expert qualifications in closing. As is the common practice, the military judge instructed the members that they should consider Dr. Boos’s qualifications as an expert, but “are not required to accept the testimony of an expert witness or give it more weight than testimony of an ordinary witness.”
Additionally, the members’ findings clearly evince the success of Appellant’s defense counsel at trial. The majority’s own statement of facts makes plain that Appellant’s conviction was assured by his own admissions and the evidence of BT’s injuries observed by treating physicians. It is unlikely that Dr. Boos’s testimony was either necessary or effective. Facing a charge of assault with a means likely to produce death or grievous bodily harm, Appellant was found guilty of assault on a child under the age of sixteen years — hardly a ringing endorsement by the court members of Dr. Boos’s testimony and certainly no support for any claim that Appellant’s counsel was hamstrung by the absence of Dr. Smith.
CONCLUSION
The majority explains its great leap past the record of trial, the findings of the military judge, and the findings of the court below as necessary to prevent the “cumulative and problematic” effect of requiring Appellant to meet his burden under Gonzalez. *133 As their Warner, 62 M.J. at 117-18 n. 11. argument goes, based on a rescinded ruling by the military judge pertaining to a related issue, which ruling expressly declined to make the findings the majority relies on, it would be “cumulative and problematic” to require the defense counsel to present evidence that he had spoken with Dr. Smith, that Dr. Smith had informed the defense how he could help them, that Dr. Smith was qualified in the manner the defense averred, or that Dr. Brown was not. This new catchphrase relieves the defense of its burden to request witnesses or present any evidence on the motion, even when both the R.C.M. and the military judge expressly afforded the defense the opportunity to do so. Further, the risk of a “cumulative and problematic” effect apparently relieved the defense even of the small burden of putting their detailed expert consultant on the stand to demonstrate either that she lied regarding her qualifications, or that she lacked the experience to assist the defense. I am at a loss to understand how the majority’s new concern for avoiding the “cumulative and problematic” does not concomitantly restrain their exercise of factfinding powers bestowed by Congress only on the courts below. Nonetheless, without any deference whatever to either the facts found by the military judge — including the determination of credibility likely applied when weighing Dr. Smith’s unattested and unauthenticated CV against Dr. Brown’s sworn affidavit — and by selectively applying inferences to Dr. Smith’s CV that they decline to apply to Dr. Brown’s affidavit, this Court substitutes its view of the facts for those of both the military judge and the court below. Finally, to buttress their factual findings, the majority imports factual findings from other eases and jurisdictions.
In affirmatively rejecting all federal precedent and authority, the majority moves us even further from the mainstream of federal practice, without any articulation of the need to do so. Sadly, today’s decision continues the majority’s increasingly frequent march away from the purpose of Article 46 and the President’s implementation thereof in R.C.M. 703.
In United States v. McAllister, 55 M.J. 270, 281-82 (C.A.A.F.2001)(Crawford, C.J., dissenting), I dissented from the Court’s relegation to a mere formality of the defense burden to establish necessity for a particular expertise. The majority’s citation of United States v. Kreutzer, 59 M.J. 773, 777 n. 4. (A.Ct.Crim.App.2004), aff'd, 61 M.J. 293 (C.A.A.F.2005), harbingers their expansion of Article 46 to include a per se right to a mitigation expert in capital litigation regardless of the number of psychiatrists, psychologists, and doctor-lawyers already assigned to the defense team. Warner, 62 M.J. at 122 n. 37. From that proposition, I have also dissented and for the same legal reasons. Kreutzer, 61 M.J. 293, 306-311 (C.A.A.F.2005)(Crawford, J., dissenting).
Today’s new proposition, unsupported by the record of trial, that the “denial of a defense expert with professional qualifications comparable to those of the Government’s expert interfered” with the defense “opportunity to obtain witnesses and other evidence,” Warner, 62 M.J. at 118, in violation of Article 46, is not only startling, but stands in sharp contrast to this Court’s analysis of an Article 46/R.C.M. 703 issue in United States v. Shelton, 62 M.J. 1 (C.A.A.F. 2005). In Shelton we assumed that the defense had met their burden in requiring Government production of two defense witnesses, and also assumed an erroneous denial of witness production by the Government. We then tested for prejudice by using the record of trial. If Congress had intended the defense to have “equal opportunity to obtain witnesses,” without regard to Presidential implementation, the defense would not be required affirmatively to demonstrate relevance and necessity and defense counsel would have subpoena power. See R.C.M. 703(c)(2)(B)(i); contra R.C.M. 703(e)(2)(C). If the defense has no burden to provide synopses or proffers, every denial of a defense witness will result in presumed prejudice.
The majority’s conclusion that “the nature of the legal error — the denial of a sufficiently qualified expert — interferes with Appellant’s ability to demonstrate prejudice,” simply ig *134 ñores the evidence, the record, and the abilities of even the most junior judge advocate.
The military society which we serve deserves, and indeed the American public expects, a military justice system that not only protects the rights of the accused but also follows established legal principles and precedents. When a court oversteps its authority and ignores its own long-standing legal precedent, it undermines the public’s confidence, as well as stability and predictability in the military justice system. If the risk of a “cumulative and problematic” effect is the talisman to be wielded by defense counsel wishing to avoid well established evidentiary burdens, what legal standards should advocates and military judges employ? Can they now be confident when they apply longstanding legal principles, procedures, and precedent? Our Constitution contains its own wise restraint on “cumulative and problematic” effects- — the separation of powers doctrine. Will the military society respect a judicial system that ignores that doctrine as well as prevailing legal standards and decisions? And will the American public have confidence that the intent of Congress in promulgating the UCMJ is being respected? I fear not.
Finally, I question whether the majority’s new expert entitlement rule and “presumed prejudice” factors will benefit the defense in the context of future trials. As is evident on this record, when the Government has denied a defense-requested expert consultant but provided a substitute, past practice has been not to focus with particularity on the qualifications of either the requested consultant or the Government consultant, but on whether the substitute was “adequate,” in a broad sense. For that reason, CVs and averments have frequently escaped scrutiny and evidentiary objection by trial counsel, since the substitute consultant was to be measured against a relatively fixed standard. As the standard is now purely comparative,[24] every degree, training program, appointment, publication, and lecture is potentially in issue and the battle may be on.
These considerations would normally, fall under the purview of the “comprehensive survey” process sagely included by Congress in the UCMJ.[25] The judge advocates general have devoted considerable assets[26] to this process, which produces the vast majority of recommendations for change to both the MCM and the UCMJ, following thorough study, debate, and public notice. We can only hope that our preemption of that rule-making process does not prove inordinately disadvantageous either to service members or the reputation of the military justice system that the majority seeks to benefit.
APPENDIX
DEPARTMENT OF THE AIR FORCE UNITED STATES AIR FORCE TRIAL JUDICIARY IN THE WESTERN CIRCUIT
UNITED STATES
v.
SRA ANTHONY W. WARNER
DECISION RE GOVERNMENT REQUEST FOR RECONSIDERATION OF ORDER GRANTING DEFENSE MOTION FOR APPROPRIATE RELIEF
Date: 1 May 2001
Subsequent to the ORDER of this court dated 25 April 2001, counsel for both sides advised the court that Doctor Brown’s TDY had been canceled and she would be available to advise the defense team. At that time, trial counsel requested the Court reconsider its ruling. The Defense having interposed no objection, the Government Request for Reconsideration is GRANTED. After reviewing the briefs of both counsel, submitted
*135 before (DC) and after (TC) the Court’s earlier ruling, the Court finds as follows:
FACTS
1. On or about 16 March 2001, the Defense submitted a request to the convening authority to appoint an individual to act as a defense expert consultant and possibly expert witness. Doctor Wilbur Smith was specifically requested.
2. On or about 15 March 2001, as a result of earlier discussions, the Government informed Defense Counsel they were proposing Doctor (Lt Col) Susan Brown as a defense consultant. Her curriculum vitae was provided to the defense on 16 March 2001.
3. On or about 3 April 2001, 12 AF/CC appointed Doctor Brown as a defense expert consultant.
4. Doctor Brown is a physician, Board certified in both pediatrics and adolescent medicine. She has approximately 14 years of experience in pediatrics, including her periods of internship and residency. Further she has continued post graduate training in child abuse and forensic pediatries, and performed as an expert consultant and/or witness in over 20 trials. Doctor Brown’s curriculum vitae, as attached to the defense original motion, is incorporated herein by reference to the extent not summarized herein.
5. Doctor (Lt Col) Stephen Boos is the government-retained expert. Doctor Boos is a physician, Board certified in pediatrics and a Fellow of the American Academy of Pediatrics. He has approximately 18 years of experience in pediatrics, including his period of residency. He has made numerous presentations on the subject of child sexual and physical abuse, has published a few articles in the field, and is presently the Air Force consultant on child abuse and neglect. Doctor Boos’ curriculum vitae, as attached to the defense original motion, is incorporated herein by reference to the extent not summarized herein.
FINDINGS AND CONCLUSIONS
6. An accused and his counsel are entitled to the assistance of an expert consultant to help them understand technical aspects of their case and to assist in the formulation of a theory of defense and how to best meet the challenge of the government’s evidence. This consultant enjoys the cloak of privilege and can therefore be fully immersed in the tactical decision-making process of the defense. However, the appointment of an expert consultant does not relieve the defense counsel of the responsibility of independently researching and studying the relevant subjects in contention. In other words, a consultant is provided to assist counsel, not do their job for them.
7. An individual provided to the defense to act in the capacity of an expert consultant need not be the premier expert in the field. Rather, the consultant must be professionally qualified in a relevant field of expertise, and be capable of analyzing court issues germane to that field and providing expert opinions and advice to the defense team. Based on the information provided, the court finds Doctor Brown is competent to act as a consultant in the area of child abuse, and specifically shaken baby syndrome.
8. An expert witness is not the same as an expert consultant. ROM 703(d) authorizes the employment of defense expert witnesses at government expense when their testimony can be shown to be relevant and necessary, and the government cannot or will not provide an adequate substitute. Defense counsel have complained that Doctor Brown is not an “adequate substitute” for Doctor Smith, them requested expert. But, defense counsel have not proffered what testimony Doctor Smith would provide to the court. Thus, it is impossible to determine if his testimony is relevant and necessary. Furthermore, the term “adequate substitute” does not mean someone with equal credentials to the requested witness. It does mean a witness who is professionally qualified by virtue of education and experience to testify about the subject at hand, and whose scientific views or opinions are consistent with those of the requested individual. Since defense counsel have not provided the court or convening *136 authority any clue what Doctor Smith’s testimony would be, they have no basis to complain that Doctor Brown is not an adequate substitute.
ORDER
The order of this court dated 25 April 2001, granting the defense request for the appointment of a new expert consultant is RESCINDED. The defense request for the appointment of a new expert consultant and witness is DENIED.
ROBERT G. GIBSON, JR., Colonel, USAF
Chief Circuit Military Judge

. Act of May 5, 1950, ch. 169, § 1 (Article 46), 64 Stat. 122 (current version codified at 10 U.S.C. § 846 (2000)).

. United States v. Warner, 62 M.J. 114, 115 (C.A.A.F.2005).

. As distinct from one arising under the United States Constitution, Supreme Court precedent, or any other source.

. United. States v. Sweeney, 14 C.M.A. 599, 602-03, 34 C.M.R. 379, 382-83 (1964).

. "Indigent Defendants. The court or a judge thereof may order at any time that a subpoena be issued upon motion or request of an indigent defendant. The motion or request shall be supported by affidavit in which the defendant shall state the name and address of each witness and the testimony which he is expected by the defendant to give if subpoenaed, and shall show that the evidence of the witness is material to the defense, that the defendant cannot safely go to trial without the witness and that the defendant does not have sufficient means and is actually unable to pay the fees of the witness.”

. United States v. Aycock, 15 C.M.A. 158, 162, 35 C. M.R. 130, 134 (1964) (citations omitted).

. The majority’s new rule implicitly modifies, among others, United States v. Garries, 22 M.J. 288 (C.M.A.1986); United States v. Gonzalez, 39 M.J. 459 (C.A.A.F.1994); United States v. Ndanyi, 45 M.J. 315 (C.A.A.F.1996); and, particularly, United States v. Ford, 51 M.J. 445 (C.A.A.F.1999).

. Palermo v. United States, 360 U.S. 343, 353, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959)(internal citations omitted).

. The majority cites several declarations of counsel, not part of the record of trial, but appended to the appellate record by this Court’s order, to support this Court’s factual findings regarding how Dr. Brown was appointed. Article 67, UCMJ, 10 U.S.C. § 867 (2000), does not empower this Court to engage in factfinding. Marking an appellate exhibit, making a declaration, or making a proffer does not constitute evidence. Cf. John W. Strong et al., McCormick on Evidence §§ 51-52 (5th ed.1999).

. R.C.M. 905(h) provides that: "Upon request, either party is entitled to an Article 39(a) session to present oral argument or have an evidentiary hearing concerning the disposition of written motions.”

. Referred to on one point by the military judge as an "assert[ion].”

. As the actual text of the military judge's first order makes abundantly clear, the military judge made no factual findings whatsoever pertaining to the qualifications of either expert. If the plain language of that order were not enough, however, the military judge's later ruling, expressly rescinding the first, should leave no doubt whatsoever that the military judge's only findings related to qualifications are those stated in his later ruling.

. A.E. X at 3. Accepting this last statement as fact, which the majority insists we must do, is problematic for Appellant. Because the defense facts establish no substantive contact between defense counsel and Dr. Smith, we must conclude that the defense counsel had the experience and training to have evaluated BT’s "case," compared it with other cases in which Dr. Smith had been involved, and concluded that BT’s case was medically and forensically similar to those other cases. This familiarity demonstrates not only that the defense needed very little in the way of an expert consultant, but also that the defense had more than adequate knowledge upon which to interview potential defense experts and effectively cross-examine Dr. Boos at trial, which the defense certainly did, perhaps with Dr. Brown’s help.

. In Short, the Court, in a 3-2 opinion, held there was no abuse of discretion in denying Appellant Government expert assistance. 50 M.J. 370. Short sought certiorari before the Supreme Court. Brief for the United States in Opposition at 1, Short v. United States, 528 U.S. 1105, 120 *129 S.Ct. 843, 145 L.Ed.2d 712 (2000)(No. 99-362), 1999 WL 33633132 (U.S.), at *1. The Solicitor General asked the Supreme Court to deny certiorari and argued that "[l]ike Ake," Federal cases "do not stand for the more general proposition asserted by petitioner of a right to government-funded expert assistance of the defendant’s choice without a showing of necessity.” Id. at 7-8, 1999 WL 33633032 at 7-8. This was partially in reliance on the papers of Justice Marshall as to the right to an expert in Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), where Chief Justice Burger concurred in the result because Justice Marshall would not limit the expert assistance to a “capital case.” Benjamin Weiser & Joan Biskupic, Marshall Lawyer Tries to Close Access to Papers, Wash. Post, May 25, 1993, at Al.

. The majority correctly observes that Ford, Gonzalez, and Ndanyi do not expressly mention Article 46 and that only Garries does. Ford, Gonzalez, and Ndanyi, however, all apply the criteria from Games (which became the Gonzalez test), relying heavily on Article 46. In Ndanyi, this Court recognized that the third prong of that test included analysis of the adequacy of government-substituted consultants and assistants. 45 M.J. at 319-20. That test will now either be modified or rejected altogether. In addition, these opinions, and many others, are rife with language inconsistent with the majority’s opinion.

. See, e.g., United States v. Bresnahan, 62 M.J. 137, 147 (C.A.A.F.2005) (Erdmann, J., dissenting). Before the ink on today’s majority opinion has even dried, one member of that majority would cite it in support of lowering the evidentiary threshold the defense must meet to acquire a government-funded expert consultant.

. First Iowa Hydro-Elect. Co-op. v. Federal Power Comm'n, 328 U.S. 152, 187, 66 S.Ct. 906, 90 L.Ed. 1143 (1946) (Frankfurter, J., dissenting).

. See Military Rule of Evidence (M.R.E.) 103(a)(2).

. As we are without factfinding power, I am unwilling to entertain the proposition that because a contrary conclusion "could have been” reached by a lower court, we may reject that court's findings of fact on that basis. Warner, 62 M.J. at 118-19 n. 20.

. In Garries, the defense rejected an appointed, confidential, defense investigator and was then properly denied $1500 for an "independent investigator” because the defense failed to demonstrate why the government-appointed asset would not fulfill their needs. 22 M.J. at 291. Claiming not to overrule or modify Garries, the majority finds, not just that an experienced pedi *131 atrician with forensic training was incapable of even recommending an expert witness or another consultant, but that the level of assistance is now to be measured against the credentials of the Government expert. If Garries were tried tomorrow, the defense would be entitled to their choice of the $1500, or an investigator with “reasonably comparable" credentials to those of the Government investigator.

. Both the assignment of weight and the comparative determination of credibility involving Dr. Smith's unattested CV and the sworn affidavit of Dr. Brown are components of factfinding within the purview of courts with factfinding authority.

. Because, in the first instance, I see no fact-finding power in the "plain language” of Article 67, I am doubly at a loss to comprehend the majority’s "bootstrapping” of factual findings from other jurisdictions into their determination of Dr. Smith’s expertise. Warner, 62 M.J. at 121-22. The implication that it was an abuse of discretion for the military judge not to have *132 adopted factual findings from other courts is mind-boggling.

. I cannot fail to emphasize that this comment, which the majority finds so egregiously unfair, referred only to fellowship training in child abuse — no mention of infant abuse or shaken baby syndrome.

. "[W]e hold that the defense was entitled to an expert who could adequately substitute for Dr. Smith and who had qualifications reasonably comparable to those of the Government expert who testified in the same subject area.” Warner, 62 M.J. at 120.

. Article 146, UCMJ, 10 U.S.C. § 946 (2000).

. See generally Department of Defense Directive 5500.17, Role and Responsibilities of the Joint Service Committee on Military Justice (May 3, 2003).